439 F.2d 584
 2 ERC 1114, 142 U.S.App.D.C. 74, 1
Envtl. L. Rep. 20,059
 ENVIRONMENTAL DEFENSE FUND, INCORPORATED et al., Petitioners,
v.
William D. RUCKELSHAUS, Administrator of the Environmental
Protection Agency& Environmental Protection Agency,
Respondents, Izaak Walton League of America, Montrose
Chemical Corporation of California, State of New York, Intervenors.
 No. 23813.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Sept. 9, 1970.
Decided Jan. 7, 1971.
 
 Mr. James W. Moorman, Washington, D.C., with whom Mr. Charles R. Halpern, Washington, D.C., was on the brief for petitioners Environmental Defense Fund, Incorporated, Sierra Club, West Michigan Environmental Action Council, and National Audubon Society. Messrs. Edward Lee Rogers and Edward Berlin, Washington, D.C., were on the brief for petitioner Environmental Defense Fund, Incorporated.
 Mr. Raymond W. Fullerton, Atty., Department of Agriculture, of the bar of the Court of Appeals Of Maryland, pro hac vice, by special leave of Court, with whom Messrs. Charles W. Bucy, Asst. Gen. Counsel, Department of Agriculture, and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for respondents. Mr. Paul M. Donovan, Atty., Department of Agriculture, also entered an appearance for respondents.
 
 
 1
 Mr. Philip Weinberg, Asst. Atty. Gen. of the State of New York, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Gordon P. MacDougall, Washington, D.C., was on the brief, for intervenor, State of New York.
 
 
 2
 Mr. Robert L. Ackerly, Washington, D.C., for intervenor, Montrose Chemical Corporation of California.
 
 
 3
 Messrs. John D. Conner, Washington, D.C., and Charles A. O'Connor, III, filed a brief on behalf of National Agricultural Chemicals Association, as amicus curiae.
 
 
 4
 Messrs. James W. Moorman and Charles R. Halpern, Washington, D.C., entered appearances for intervenor, Izaak Walton League of America.
 
 
 5
 Before BAZELON, Chief Judge, and ROBINSON and ROBB, Circuit judges.
 
 BAZELON, Chief Judge:
 
 6
 This is a petition for review of an order of the Secretary of Agriculture,[1] refusing to suspend the federal registration of the pesticide DDT or to commence the formal administrative procedures that could terminate that registration. We conclude that the order was based on an incorrect interpretation of the controlling statute, and accordingly remand the case for further proceedings.
 
 
 7
 * At the outset, we reject respondents' contention that this court lacks jurisdiction to entertain the petition.[2] The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) provides that for certain purposes pesticides must be registered with the Secretary of Agriculture, and that in order to be registered a pesticide must conform to the statutory standards for product safety.[3] When it appears that a registered pesticide fails to conform to these standards, its registration is subject to cancellation in accordance with procedures prescribed by statute.[4] In the ordinary case, the administrative process begins when the Secretary issues a notice of cancellation to the registrant. The matter may then be referred, at the request of the registrant, to a scientific advisory committee, and to a public hearing, before the Secretary issues the order that effectively cancels or continues the registration. Instead of issuing a notice of cancellation, the Secretary may alternatively initiate the process by summarily suspending a registration, when 'necessary to prevent imminent hazard to the public.' In that case, the registrant is similarly entitled to call for a scientific advisory committee and a public hearing, though the hearing is to be expedited. The suspension order thus operates to afford interim relief during the course of the lengthy administrative proceedings. Certain orders of the Secretary relating to suspension or cancellation are reviewable in this court at the instance of any person who will be adversely affected.[5]
 
 
 8
 Petitioners here are organizations engaged in activities relating to environmental protection.[6] On October 31, 1969, they submitted a petition to the Secretary requesting him to issue notices of cancellation with respect to all registrations of pesticides containing DDT, and further, to suspend those registrations pending the conclusion of the administrative proceedings. They submitted extensive scientific documentation in support of their petition. The Secretary initially issued notices of cancellation with respect to some uses of DDT, and published in the Federal Register a notice announcing his intention to issue cancellation notices with respect to all other DDT uses that are not essential for the protection of human health; he invited comments on that proposal.[7] No action was taken on the request for summary suspension.
 
 
 9
 On May 28, 1970, this court concluded that the Secretary's silence on the request for suspension was equivalent to a denial of that request, and that the denial was reviewable as a final order, because of its immediate impact on the parties.[8] The court remanded the case to the Secretary for a fresh determination on the question of suspension and for a statement of the reasons for his decision. With respect to the request for cancellation notices, we similarly remanded for a decision on the record or for a statement of reasons for deferring the decision, but we reserved judgment on the question whether there was presently a decision ripe for review in this court. We rejected the suggestion that petitioners lack standing to seek review of the action of the Secretary, and that the decisions with respect to suspension and cancellation are committed by law to the unreviewable discretion of the Secretary.[9] No new arguments have been rpesented that cast doubt on the correctness of those conclusions, and we reaffirm them today.
 
 II
 
 10
 We are not persuaded to reach a different result by the recent opinion of the Seventh Circuit in Nor-Am Agricultural Products, Inc. v. Hardin.[10] In Nor-Am, the court en banc held that an order suspending the registration of a fungicide under the FIFRA was not reviewable by means of a suit for injunction in the district court. The Nor-Am court found that the plaintiffs in that case had failed to show a threat of irreparable injury sufficient to warrant injunctive relief in the district court.[11] The plaintiff-manufacturers based their claim largely on the prospect of financial losses, whoch the court found insufficient in comparison with the possibility of harm to the public health and safety.
 
 
 11
 While that analysis is sufficient to explain the result in Nor-Am, the court also indicated that the plaintiffs in that case would have been equally unsuccessful had they sought statutory review in the court of appeals. In the view of the Nor-Am court, a suspension order lacks the finality that is a prerequisite both to statutory review in the court of appeals under the FIFRA, and to review in any court under the Administrative Procedure Act.[12] In the view of the Nor-Am court, judicial review under the FIFRA is limited to those orders made after full administrative adjudication on the record.[13] The court acknowledged that an exception might be made for orders denying suspension, like the order involved in this case, because an order denying suspension may terminate the administrative process. But an order granting suspension will always be followed by further administrative proceedings, and therefore it is not ripe for review in the view of the Nor-Am court.[14]
 
 
 12
 We do not find in the FIFRA any conclusive indication that Congress intended to limit review to those orders made after advisory committee proceedings and a public hearing. Nor-Am relies on the provision that administrative findings of fact 'shall be sustained if supported by substantial evidence when considered on the record as a whole,' and the further provision that the record shall include 'any report and recommendation of an advisory committee.'[15] Those provisions indicate that Congress contemplated that judicial review would ordinarily occur at the instance of the manufacturer, after advisory committee proceedings and a public hearing.[16] But they do not make advisory committee proceedings or a public hearing a jurisdictional prerequisite to review. In the first place, statutory review is available to persons other than the manufacturer, who may have no right to call for advisory committee proceedings or a public hearing.[17] In the second place, the manufacturer himself may in some circumstances be entitled to judicial review of an administrative determination that is not subject to further consideration in subsequent administrative proceedings.[18] In either case, the lack of a committee report and a hearing record may limit the scope of review, but it does not preclude review entirely.[19]
 
 
 13
 Nor can we find in the statutory scheme any support for the Nor-Am distinction between orders granting and denying suspension. For the administrative proceedings that follow suspension are equally available after a refusal to suspend. If the Secretary orders suspension, the proceedings are expedited; otherwise they may follow in due course after he issues cancellation notices. In either event, there is a prospect of further administrative action, but that prospect does not resolve for us the question of reviewability. The subsequent proceedings are designed solely to resolve the ultimate question whether cancellation is warranted, and not to shed any further light on the question whether there is a sufficient threat of 'imminent hazard' to warrant suspension in the interim. Once the Secretary has made a decision with respect to suspension, whether he decides to grant or to deny that relief, the 'imminence' of the hazard is no longer at issue. To determine whether an order relating to suspension is reviewable, therefore, it is necessary to look beyond the mere availability of further administrative proceedings and consider whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case.
 
 
 14
 When we turn our attention to the impact of the order, the Nor-Am opinion suggests still another ground for distinguishing a suspension order from an order denying suspension. The court emphasized the fact that the Nor-Am suspension order threatened harm primarily to plaintiff's private interest in business profits. This case, on the other hand, involves an order denying suspension, which threatens harm to the public interest in health and safety. It might be argued that harm to the public health is more serious and irreparable than private economic injury, and that consequently the denial of suspension at issue in this case is reviewable while the Nor-Am suspension order is not.[20]
 
 
 15
 A threat of economic injury has always been regarded as sufficient, however, for the purpose of finding an order final and reviewable.[21] In our view, a suspension order, like an order denying suspension, is subject to judicial review in a proper case. The differences between the two types of orders are primarily relevant not to reviewability, but to the merits of the controversy.[22]
 
 
 16
 In this case, however, we need not decide in what circumstances an order granting suspension is subject to judicial review. We decide only that an order denying suspension on the ground that there is no threat of 'imminent hazard' is sufficiently final in its impact to warrant judicial review under the FIFRA.
 
 III
 
 17
 Turning from suspension to the question of cancellation notices, we find substantial merit in the distinction suggested by Nor-Am. That is, a decision of the Secretary to issue cancellation notices is not reviewable, because it merely sets in motion the administrative process that terminates in a reviewable final order.[23] An unqualified refusal to issue notices, on the other hand, operates with finality as an administrative rejection of the claim that cancellation is required.[24]
 
 
 18
 If the Secretary had simply refused to issue the requested notices of cancellation, we would have no difficulty concluding that his order was a final order, ripe for review in this court in accordance with the FIFRA. Here, however, the Secretary has taken the position that investigations are still in progress, that final determinations have not yet been made concerning the uses for which cancellation notices have not yet issued. Therefore, with respect to the cancellation notices, we treat the petition as a request for relief in the nature of mandamus, to compel the Secretary to issue notices as required by statute.[25]
 
 
 19
 The FIFRA gives this court jurisdiction to review any order granting or denying the cancellation of a pesticide registration.[26] The Secretary could defeat that jurisdiction, however, by delaying his determination indefinitely. Petitioners contend that the Secretary's own findings with respect to DDT compel him to issue cancellation notices, and hence that his action is 'unlawfully withheld or unreasonably delayed' within the meaning of the Administrative Procedure Act.[27] In order to protect our appellate jurisdiction, this court has jurisdiction to entertain a request for relief in the form of an order directing the Secretary to act in accordance with the FIFRA.[28]
 
 
 20
 The relevant question, therefore, is whether the FIFRA requires the Secretary to issue cancellation notices in the circumstances of this case. The statute provides that 'the Secretary, in accordance with the procedures specified herein, may suspend or cancel the registration of an economic poision whenever it does not appear that the article or its labeling or other material required to be submitted complies with the provisions of sections 135-135k of this title.'[29] That language vests discretion in the Secretary to determine whether an article is in compliance with the act, and to decide what action should be taken with respect to a nonconforming article. Nevertheless, his decisions are reviewable for abuse of discretion.[30] For guidance in defining the limits of his discretion, we must turn to the legislative history and to the statutory scheme as a whole.
 
 
 21
 Prior to 1964, the FIFRA required the Secretary to register 'under protest' any pesticide or other item that failed to meet the statutory requirements. The product remained on the market, and the Secretary reported the violation to the United States Attorney for possible prosecution.[31] In 1964 the statute was amended to eliminate the system of protest registration, and substitute the present administrative mechanism for cancelling registrations.[32] The stated purpose of the amendment was to protect the public by removing from the market any product whose safety or effectiveness was doubted by the Secretary.[33] The legislative history supports the conclusion that Congress intended any substantial question of safety to trigger the issuance of cancellation notices, shifting to the manufacturer the burden of proving the safety of his product.[34]
 
 
 22
 Not only the legislative history, but also the statutory scheme itself points to the conclusion that the FIFRA requires the Secretary to issue notices and thereby initiate the administrative process whenever there is a substantial question about the safety of a registered pesticide. For when Congress creates a procedure that gives the public a role in deciding important questions of public policy, that procedure may not lightly be sidestepped by administrators.[35] The cancellation decision does not turn on a scientific assessment of hazard alone. The statute leaves room to balance the benefits of a pesticide against its risks.[36] The process is a delicate one, in which greater weight should be accorded the value of a pesticide for the control of disease, and less weight should be accorded its value for the protection of a commercial crop. The statutory scheme contemplates that these questions will be explored in the full light of a public hearing and not resolved behind the closed doors of the Secretary. There may well be countervailing factors that would justify an administrative decision, after committee consideration and a public hearing, to continue a registration despite a substantial degree of risk, but those factors cannot justify a refusal to issue the notices that trigger the administrative process.[37]
 
 
 23
 In this case the Secretary has made a number of findings with respect to DDT. On the basis of the available scientific evidence he has concluded that (1) DDT in large doses has produced cancer in test animals and various injuries in man, but in small doses its effect on man is unknown; (2) DDT is toxic to certain birds, bees, and fish, but there is no evidence of harm to the vast majority of species of nontarget organisms; (3) DDT has important beneficial uses in connection with disease control and protection of various crops. These and other findings led the Secretary to conclude 'that the use of DDT should continue to be reduced in an orderly, practicable manner which will not deprive mankind of uses which are essential to the public health and welfare. To this end there should be continuation of the comprehensive study of essentiality of particular uses and evaluations of potential substitutes.'[38]
 
 
 24
 There is no reason, however, for that study to be conducted outside the procedures provided by statute. The Secretary may, of course, conduct a reasonable preliminary investigation before taking action under the statute. Indeed, the statute expressly authorizes him to consult a scientific advisory committee, apart from the committee that may be appointed after the issuance of a cancellation notice.[39] But when, as in this case, he reaches the conclusion that there is a substantial question about the safety of a registered item, he is obliged to initiate the statutory procedure that results in referring the matter first to a scientific advisory committee and then to a public hearing. We recognize, of course, that one important function of that procedure is to afford the registrant an opportunity to challenge the initial decision of the Secretary. But the hearing, in particular, serves other functions as well. Public hearings bring the public into the decision-making process, and create a record that facilitates judicial review.[40] If hearings are held only after the Secretary is convinced beyond a doubt that cancellation is necessary, then they will be held too seldom and too late in the process to serve either of those functions effectively.
 
 
 25
 The Secretary's statement in this case makes it plain that he found a substantial question concerning the safety of DDT, which in his view warranted further study. Since we have concluded that that is the standard for the issuance of cancellation notices under the FIFRA, the case must be remanded to the Secretary with instructions to issue notices with respect to the remaining uses of DDT, and thereby commence the administrative process.
 
 IV
 
 26
 While the Secretary recognized a substantial question concerning the safety of DDT, he concluded that the evidence did not warrant summary suspension of its registration for any purpose. That conclusion reflects both a factual determination and the application of a legal standard. Suspension is designed to protect the public from an 'imminent hazard' during the course of further administrative proceedings. In order to decide whether it is warranted in a particular case, the Secretary must first determine what harm, if any, is likely to flow from the use of the product in question during the course of administrative proceedings. He must consider both the magnitude of the anticipated harm, and the likelihood that it will occur. Then, on the basis of that factual determination, he must decide whether the anticipated harm amounts to an 'imminent hazard to the public.'
 
 
 27
 Petitioners do not challenge the Secretary's determination of the kinds of harm that may be associated with DDT. They argue that his estimate of the probability that harm will occur is too low, in light of the available reports of scientific studies. They also argue that he has set the standard of proof too high, in light of the clear legislative purpose. On the first point, we think it appropriate in the circumstances of this case to defer to the administrative judgment. We have neither an evidentiary record, nor the scientific expertise, that would permit us to review the Secretary's findings with respect to the probability of harm. We have found no error of law that infects the Secretary's inferences from the scientific data.[41] And we have recognized that it is particularly appropriate to defer to administrative findings of fact in reviewing a decision on a question of interim relief.[42]
 
 
 28
 The second part of the petitioners' challenge, however, is entirely appropriate for judicial consideration at this time. The formulation of standards for suspension is entrusted to the Secretary in the first instance, but the court has an obligation to ensure that the administrative standards conform to the legislative purpose, and that they are uniformly applied in individual cases.
 
 
 29
 The statute provides for suspension in order 'to prevent an imminent hazard to the public.' Congress clearly intended to protect the public from some risks by summary administrative action pending further proceedings. The administrator's problem is to determine which risks fall in that class. The Secretary has made no attempt to deal with that problem, either by issuing regulations relating to suspension,[43] or by explaining his decision in this case.[44] If regulations of general applicability were formulated, it would of course be possible to explain individual decisions by reference to the appropriate regulation. It may well be, however, that standards for suspension can best be developed piecemeal, as the Secretary evaluates the hazards presented by particular products. Even so, he has an obligation to articulate the criteria that he develops in making each individual decision. We cannot assume, in the absence of adequate explanation, that proper standards are implicit in every exercise of administrative discretion.
 
 
 30
 Since the Secretary has not yet provided an adequate explanation for his decision to deny interim relief in this case, it will be necessary to remand the case once more, for a fresh determination on that issue. On remand, the Secretary should consider whether the information presently available to him calls for suspension of any registrations of products containing DDT, identifying the factors relevant to that determination, and relating the evidence to those factors in a statement of the reasons for his decision.
 
 
 31
 In the course of this and subsequent litigation, the Secretary has identified some of the factors he deems relevant to the question of suspension, and resolved some questions of statutory interpretation. He has concluded that the most important element of an 'imminent hazard to the public' is a serious threat to public health,[45] that a hazard may be 'imminent' even if its impact will not be apparent for many years,[46] and that the 'public' protected by the suspension provision includes fish and wildlife.[47] These interpretations all seem consistent with the statutory language and purpose. An important beginning has been made, and the task of formulating standards must not be abandoned now.
 
 
 32
 We stand on the threshold of a new era in the history of the long and fruitful collaboration of administrative agencies and reviewing courts. For many years, courts have treated administrative policy decisions with great deference, confining judicial attention primarily to matters of procedure.[48] On matters of substance, the courts regularly upheld agency action, with a nod in the direction of the 'substantial evidence' test,[49] and a bow to the mysteries of administrative expertise.[50] Courts occasionally asserted, but less often exercised, the power to set aside agency action on the ground that an impermissible factor had entered into the decision, or a crucial factor had not been considered. Gradually, however, that power has come into more frequent use, and with it, the requirement that administrators articulate the factors on which they base their decisions.[51]
 
 
 33
 Strict adherence to that requirement is especially important now that the character of administrative litigation is changing. As a result of expanding doctrines of standing and reviewability,[52] and new statutory causes of action,[53] courts are increasingly asked to review administrative action that touches on fundamental personal interests in life, health, and liberty. These interests have always had a special claim to judicial protection, in comparison with the economic interests at stake in a ratemaking or licensing proceeding.
 
 
 34
 To protect these interests from administrative arbitrariness, it is necessary, but not sufficient, to insist on strict judicial scrutiny of administrative action. For judicial review alone can correct only the most egregious abuses. Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion.[54] Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible.[55] Rules and regulations should be freely formulated by administrators, and revised when necessary.[56] Discretionary decisions should more often be supported with findings of fact and reasoned opinions.[57] When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process, and to improve the quality of judicial review in those cases where judicial review is sought.
 
 
 35
 Remanded for further proceedings consistent with this opinion.
 
 ROBB, Circuit Judge (dissenting):
 
 36
 In my view the majority opinion substitutes the judgment of this court for the judgment of the Secretary in a matter committed to his discretion by law. This action is taken without the benefit of any administrative hearing in which the validity of the petitioner's forebodings and the soundness of the Secretary's discretionary action might be tested. In effect, the court is undertaking to manage the Department of Agriculture. Finding nothing in the statutes that gives us such authority I respectfully dissent.
 
 
 
 [1]
 The functions of the Secretary of Agriculture under the relevant statute have been transferred to the Administrator of the new Environmental Protection Agency. Reorg. Plan No. 3 of 1970, 2(8)(i), U.S.Code Cong. & Ad.News, p. 2996, 2998, 91st Cong., 2d Sess. (1970). Accordingly, the Administrator has been substituted for the Secretary as a party to this litigation. 5 U.S.C. 907(c) (Supp. V, 1970)
 
 
 [2]
 See Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970) (denying motion to dismiss for lack of jurisdiction) (hereinafter cited as EDF v. Hardin)
 
 
 [3]
 7 U.S.C. 135-135k (1964). The statutory scheme is summarized in EDF v. Hardin, 138 U.S.App.D.C. at 393, 428 F.2d at 1095nn.2-4. For the relationship of the FIFRA to the Food, Drug, and Cosmetic Act, 21 U.S.C. 301-392, in the regulation of pesticides, see Environmental Defense Fund, Inc. v. United States Dept. of HEW, 138 U.S.App.D.C. 381, 384-386, 428 F.2d 1083, 1386-1088 (1970)
 
 
 [4]
 7 U.S.C. 135b(c)
 
 
 [5]
 7 U.S.C. 135b(c) provides that 'final orders of the Secretary under this section shall be subject to judicial review, in accordance with the provisions of subsection (d) of this section.' Subsection (d) provides for judicial review in this court of 'any order under this section.' We have assumed, without deciding, that 135b(d) does not expand the class of orders reviewable under the FIFRA, and we treat the problem entirely as a question of determining what orders are 'final' for the purpose of judicial review
 
 
 [6]
 See EDF v. Hardin, 138 U.S.App.D.C. at 393, 428 F.2d at 1095n.5. Subsequent to our decision in EDF v. Hardin, this court permitted the state of New York to intervene in support of the petition. Montrose Chemical Corporation of California was granted leave to intervene in support of the Secretary, and the National Agricultural Chemicals Association was granted leave to file a brief amicus curiae
 
 
 [7]
 The proposal appeared at 34 Fed.Reg. 18827 (Nov. 25, 1969). The notices of cancellation issued at that time concerned the use of DDT on shade trees, on tobacco, around the home, and in aquatic environments. U.S. Dep't of Agriculture, Pesticides Regulation Div., PR Notice 69-17 (Nov. 20, 1969) (materials submitted by appellees at VI-4); see 34 Fed.Reg. 18827 (1969). Previously the Secretary had issued notices concerning certain uses of DDT on lettuce and cabbage, USDA-PRD, PR Notice 69-7 (Mar. 26, 1969) (materials at VI-3), and houseflies and roaches, USDA-PRD, PR Notice 67-9 (Nov. 2, 1967) (materials at VI-1). Apparently he had also issued notices concerning the use of DDT on alfalfa and a variety of other food crops, see 33 Fed.Reg. 7091 (May 11, 1968); that list was subsequently expanded, see 34 Fed.Reg. 7712 (May 15, 1969); 35 Fed.Reg. 7135 (May 6, 1970)
 While this litigation was pending, the Secretary issued notices concerning a number of other uses. USDA-PRD, PR Notice 70-19 (Aug. 18, 1970), Appendix of Montrose Chemical Corp. as Intervenor at 110; see 'Decision on DDT Uses for Cotton Insects' (Nov. 1970), memorandum filed by appellees. Petitioners have suggested to this court that they are having some difficulty in discovering the present status of administrative action; any request for disclosure should of course be addressed in the first instance to the administrative agency.
 
 
 [8]
 EDF v. Hardin, 138 U.S.App.D.C. at 396-397, 428 F.2d at 1098-1099. The test of finality for purposes of review is not whether the order is the last administrative order contemplated by the statutory scheme, but rather whether it imposes an obligation or denies a right with consequences sufficient to warrant review. See, e.g., cases cited in EDF v. Hardin, 138 U.S.App.D.C. at 396, 428 F.2d at 1098n.22. The Secretary's refusal to suspend registrations in this case is analogous to a district court's denial of a temporary restraining order. The denial of a temporary restraining order is appealable as a 'final decision' under 28 U.S.C. 1291 when it 'determin(es) substantial rights of the parties which will be irreparably lost if review is delayed * * *.' United States v. Wood, 295 F.2d 772, 778 (5th Cir. 1961), cert. denied, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962). Similarly, the denial of a suspension order must be reviewable as a final order where, as here, the moving papers before the court support the allegation that the denial subjects the public to an imminent hazard, and that any injury is irreparable
 
 
 [9]
 For the proposition that the permissive statutory term 'may' does not preclude judicial review, see Mulloy v. United States, 398 U.S. 410, 416-418, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970), in addition to EDF v. Hardin, 138 U.S.App.D.C. at 395-396, 428 F.2d at 1097-1098, and sources cited. See generally Berger, administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969), and sources cited id. at 966n.9
 
 
 [10]
 435 F.2d 1151 (Decided Nov. 9, 1970) (en banc)
 
 
 [11]
 Id. at 1159-1161
 
 
 [12]
 Id. at 1155-1159
 
 
 [13]
 Id. at 1157
 
 
 [14]
 The Nor-Am court distinguished the earlier opinion of this court in EDF v. Hardin on this ground, and also on the ground that EDF v. Hardin involved the Secretary of HEW and the administration of the Food, Drug, and Cosmetic Act. 435 F.2d at 1159-1160. The latter ground is of course factually incorrect, and presumably reflects some confusion with Environmental Defense Fund, Inc. v. United States Dept. of HEW, supra note 3
 
 
 [15]
 7 U.S.C. 135b(d); see Nor-Am, 435 F.2d at 1157
 
 
 [16]
 A manufacturer who failed to call for advisory committee proceedings and a public hearing might well be barred from seeking judicial review by the doctrine of exhaustion of administrative remedies
 
 
 [17]
 The FIFRA purports to give only the registrant the right to call for an advisory committee or a public hearing, whereas judicial review is available to 'any person who will be adversely affected.' We do not reach the question whether persons other than the registrant may in some circumstances be entitled to call for an advisory committee or a public hearing under liberalized principles of standing to intervene in administrative proceedings. See National Welfare Rights Organization v. Finch, 139 U.S.App.D.C. 46, 429 F.2d 725 (1970)
 
 
 [18]
 The manufacturer may, for example, concede that his product is subject to cancellation, but deny that it warrants suspension as an imminent hazard
 
 
 [19]
 See Foti v. Immigration and Naturalization Service, 375 U.S. 217, 228-229 & n. 15, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963)
 
 
 [20]
 The Nor-Am court did not adopt this approach to the problem of reviewability, but it adopted a similar approach to the problem of the appropriateness of injunctive relief. 435 F.2d at 1159-1161. The irreparable character of any harm threatened is of course one of several factors relevant to both the propriety of affording injunctive relief and the propriety of permitting judicial review of an order that lacks some of the ordinary indicia of finality. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-547, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)
 
 
 [21]
 E.g., Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, cert. denied, Japan-Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954)
 
 
 [22]
 Because the statute places on the manufacturer the burden of proving the continued safety of his products, see note 34 infra, an administrative order of suspension is entitled to greater judicial deference than an order denying suspension
 
 
 [23]
 Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); FPC v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938). At least one district court has reached a contrary conclusion, holding that a notice of cancellation under the FIFRA is a reviewable final order. Pax Co. v. United States, 324 F.Supp. 1335 (D.Utah, filed Sept. 16, 1970)
 
 
 [24]
 See Medical Committee for Human Rights v. SEC, 139 U.S.App.D.C. 226, 232-239, 432 F.2d 659, 665-672 (1970), cert. granted, 401 U.S. , 91 S.Ct. 1191, 28 L.Ed.2d 322; Trailways of New England, Inc. v. CAB, 412 F.2d 926 (1st Cir. 1969)
 
 
 [25]
 In re Harmon, 425 F.2d 916 (1st Cir. 1970); International Products Corp. v. Koons, 325 F.2d 403 (2d Cir. 1963); see 9 Moore's Federal Practice 110.28, at 316 (1970)
 
 
 [26]
 7 U.S.C. 135b(d) provides for judicial review of 'any order under this section.' The relevant section is 135b, which sets forth the whole system of registration, suspension, and cancellation
 
 
 [27]
 5 U.S.C. 706(2) (Supp. V, 1970)
 
 
 [28]
 28 U.S.C. 1651; Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 25, 63 S.Ct. 938, 87 L.Ed. 1185 (1943); see 9 Moore's Federal Practice 110.28, at 303-306 (1970)
 
 
 [29]
 7 U.S.C. 135b(c)
 
 
 [30]
 See sources cited at note 9 supra
 
 
 [31]
 Federal Insecticide, Fungicide, and Rodenticide Act, 1947, c. 125, 4, 6, 61 Stat. 163; U.S.Code Cong.Service, p. 170, 80th Cong., 1st Sess. (1947)
 
 
 [32]
 Pub.L. No. 88-305, 78 Stat. 190; 1 U.S.Code Cong. & Ad.News p. 227, 88th Cong., 2d Sess. (1964)
 
 
 [33]
 H.R.Rep.No.1125, 88th Cong., 2d Sess. (1964); 1 U.S.Code Cong. & Ad.News p. 2166, 88th Cong., 2d Sess. (1964)
 
 
 [34]
 See 110 Cong.Rec. 2948-49 (1964) (remarks of Congresswoman Sullivan):
 I am strongly in favor of the Legislation now before you to require industry, rather than the Federal Government, to shoulder the burden of proof in connection with the marketing of pesticides which may be unsafe for use as intended. The burden of proof should not rest on the Government, because great damage can be done during the period the Government is developing the data necessary to remove a product which should not be marketed.
 See also H.R.Rep.No.1125, supra; S.Rep.No.573, 88th Cong., 2d Sess. (1964). Our construction of the FIFRA also finds strong support in a 1969 report of the House Committee on Government Operations, reviewing the administration of the statute. The Committee strongly criticized the administrators for failing to take 'prompt or effective cancellation action in cases where it had reason to believe a registered product might be ineffective or potentially hazardous. * * * A mistaken belief that positive evidence of hazard-- rather than simply a lack of adequate assurance of safety-- is necessary to support a cancellation action appears to have been a factor in (the) failure to initiate such action in cases where it was obviously justified.' H.R.Rep.No.91-637, 91st Cong., 1st Sess. 15-16 (1969).
 
 
 [35]
 See Moss v. CAB, 139 U.S.App.D.C. 150, 159-161, 430 F.2d 891, 900-902 (1970); D.C. Federation of Civic Associations, Inc. v. Volpe, 140 U.S.App.D.C. 162, 166-169, 434 F.2d 436, 440-443 (1970)
 
 
 [36]
 The Senate Committee on Government Operations, in a 1966 report on federal policy with respect to pesticides, emphasized the importance of balancing benefits against risks in formulating that policy. S.Rep.No.1379, 89th Cong., 2d Sess. pp. 13, 27, 52, 64-65 (1966)
 
 
 [37]
 Ordinarily the arguments against cancellation will be presented by the registrant, who will invoke his statutory right to delay the effective date of cancellation by calling for further administrative proceedings. In the unlikely event that he fails to do so, and the Secretary nevertheless concludes on the basis of his own investigation that the benefits of the pesticide outweigh its risks, we are at this time aware of nothing that would prevent him from withdrawing the notice. Alternatively, although we do not reach the question here, the Secretary might consider extending to other interested persons by regulation the rights conferred on the registrant by statute. See note 17 supra
 
 
 [38]
 Statement of the Reasons Underlying the Decisions on Behalf of the Secretary with respect to the Registrations of Products Containing DDT, June 29, 1970, at 13
 
 
 [39]
 The Senate version of the 1964 amendment provided that 'the Secretary, on his own motion, may at any time refer such a matter (cancellation of a registration) to an advisory committee.' S.Rep.No.573 (on S. 1605), 88th Cong., 2d Sess. 22 (1964). The House deleted that provision, apparently to deprive the Secretary of the power to delay the appeal process by calling for his own advisory committee after he had made a final determination to cancel a registration. The House version, which became law, included instead a provision stating that 'in connection with consideration of any registration or application for registration under this section, the Secretary may consult with any other Federal agency or with an advisory committee * * *.' 7 U.S.C. 135b(c). Although it is hardly clear from the statutory language, this provision was intended to give the Secretary the right to consult with an advisory committee during his preliminary investigations, but not after he had reached a decision. H.R.Rep.No.1125, 88th Cong., 2d Sess. 3 (1964); 1 U.S.Code Cong. & Ad.News 2168, 88th Cong., 2d Sess. (1964)
 
 
 [40]
 See Moss v. CAB, 139 U.S.App.D.C. at 159-161, 430 F.2d at 900-902
 
 
 [41]
 Petitioners contend that because DDT has produced cancer in test animals, the Secretary is compelled as a matter of law to infer that there is a high probability that it causes cancer in man. That inference is of course not compelled by the Delaney Amendment to the Food, Drug, and Cosmetic Act, 21 U.S.C. 348(c)(3)(A) because the Delaney Amendment applies only to food additives. Environmental Defense Fund, Inc. v. United States Dept. of HEW, 138 U.S.App.D.C. at 388-390, 428 F.2d at 1090-1092. The Amendment does, however, indicate the magnitude of Congressional concern about the hazards created by carcinogenic chemicals, and places a heavy burden on any administrative officer to explain the basis for his decision to permit the continued use of a chemical known to produce cancer in experimental animals. Id. at 390, 428 F.2d at 1092
 
 
 [42]
 National Air Carrier Ass'n v. ,CAB, 141 U.S.App.D.C. 31, 40, 436 F.2d 185, 194 (1970)
 
 
 [43]
 The House Committee on Government Operations commented on the absence of regulations in its report on 'Deficiencies in Administration of Federal Insecticide, Fungicide, and Rodenticide Act.' H.R.Rep.No.91-637, supra note 34, at 16
 
 
 [44]
 The Secretary's Statement of Reasons in this case does not even recite the statutory criterion for suspension. It states only that 'the suspension of any DDT registration is not warranted at this juncture.' Statement, supra note 38, at 13
 
 
 [45]
 Statement of the Reasons Underlying the Decision of the Secretary with respect to the Registrations of Products Containing 2,4,5-T, Aug. 31, 1970, at 2-4, Wellford v. Ruckelshaus, 140 U.S.App.D.C. , 439 F.2d 598 (decided today). The statement adopts the interpretation of 'imminent hazard' formulated in the original panel opinion in Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1133 at 1142-1143 (7th Cir. July 15, 1970), vacated and decided en banc on other grounds, 435 F.2d 1151 (Nov. 9, 1970). That interpretation was drawn in turn from the legislative history of an analogous provision in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 355(e), on which the FIFRA provision was apparently modeled
 
 
 [46]
 Wellford Statement, supra note 45, at 4. There is no suggestion that the Secretary refused to consider the possible carcinogenic effects of DDT, on the ground that such a long-range hazard could not in any event be regarded as 'imminent.' His statement in this case shows, rather, that he found no reason to believe that DDT is carcinogenic in man at normal levels of exposure. See note 41 supra
 
 
 [47]
 Respondents' Supplemental Memorandum, September 21, 1970, at 10; see S.Rep.No.573, 88th Cong., 2d Sess. 3 (1964)
 
 
 [48]
 E.g., Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951); S.S.W., Inc. v. Air Transport Ass'n of America, 89 U.S.App.D.C. 273, 191 F.2d 658 (1951), cert. denied, 343 U.S. 955, 72 S.Ct. 1049, 96 L.Ed. 1355 (1952); see L. Jaffe, Judicial Control of Administrative Action 565-566 (1965)
 
 
 [49]
 See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Administrative Procedure Act, 5 U.S.C. 706(2)(E)
 
 
 [50]
 E.g., Radio Corp. of America v. United States, 341 U.S. 412, 71 S.Ct. 806, 95 L.Ed. 1062 (1951)
 
 
 [51]
 See Greater Boston Television Corp. v. FCC, U.S.App.D.C. (No. 17,785, decided Nov. 13, 1970), (Slip opinion at 20-21)
 
 
 [52]
 Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conf., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966)
 
 
 [53]
 See, e.g., Federal Hazardous Substances Act, 15 U.S.C. 1261 et seq. (1964), as amended, (Supp. V, 1970): S. 3201, 91st Cong., 2d Sess. (1970) (consumer class actions)
 
 
 [54]
 For a thoughtful discussion of this problem, see K. Davis, Discretionary Justice (1969). This court has often commented on the importance of providing a structure for the exercise of administrative discretion, in the course of reviewing administrative decisions regarding the disposition of the mentally ill. See, eG., Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637 (1970); Dixon v. Jacobs, 138 U.S.App.D.C. 319, 327-328, 427 F.2d 589, 597-598 (1970); Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); Bolton v. Harris, 130 U.S.App.D.C. 1, 11-12 & n. 58, 395 F.2d 642, 652-653 & n. 58 (1968); Rouse v. Cameron, 125 U.S.App.D.C. 366, 371 n. 22, 373 F.2d 451, 456 n. 22 (1966)
 
 
 [55]
 Professor Davis suggests that such a requirement would be a suitable replacement for the old non-delegation doctrine, which purports to require legislators to set meaningful standards when they delegate discretionary powers to administrators. Davis, supra, at 57-59
 
 
 [56]
 In this connection we note that in August 1969 the Secretary of Agriculture published the first regulations dealing with the FIFRA cancellation procedure. 7 C.F.R. 364.1 et seq. (1970). These regulations barely begin to scratch the problems involved in the administration of this statute
 
 
 [57]
 See Davis, supra, at 103-106