**ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and William D. Ruckelshaus, Administrator, Respondents.**

**No. 71–1365.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1971.

Decided May 5, 1972.

As Amended May 16, 1972.

Mr. William A. Butler, East Setauket, N. Y., with whom Messrs. Edward Lee Rogers, East Setauket, N. Y., Edward Berlin and James W. Moorman, Washington, D. C., were on the brief, for petitioner.

Mr. Michael C. Farrar, Asst. Gen. Counsel, Environmental Protection Agency, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Alan S. Rosenthal, Atty. Dept. of Justice, and Thomas H. Kemp, Atty. Environmental Protection Agency, were on the brief, for respondents.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

On December 3, 1970, petitioner Environmental Defense Fund (EDF), a non-profit New York corporation,[1] peti-

---

1. We begin with a few words on standing in view of the Supreme Court's recent decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (April 19, 1972).

The case before us is different from *Sierra* in that petitioner was permitted to participate in the administrative proceedings, and the Government did not object that petitioner does not qualify under the FIFRA provision for review in a court of appeals on petition of "any person who will be adversely affected" by an order, 7 U.S.C. 135b(d).

Since this is a statutory rather than a constitutional question, it is not clear whether it is jurisdictional and must be raised sua sponte, a problem suggested by footnote 7 of *Sierra*. However, if it were plain that there was a demonstrable and

tioned the Environmental Protection Agency (EPA) under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135–135k, for the immediate suspension and ultimate cancellation of all registered uses of aldrin and dieldrin, two chemically similar chlorinated hydrocarbon pesticides. On March 18, 1971, the Administrator of the EPA announced the issuance of "notices of cancellation" for aldrin and dieldrin because of "a substantial question as to the safety of the registered products which has not been effectively countered by the registrant." He declined to order the interim remedy of suspension, pending final decision on

cancellation after completion of the pertinent administrative procedure, in light of his decision that "present uses [of aldrin and dieldrin] do not pose an imminent threat to the public such as to require immediate action." EDF filed this petition to review the EPA's failure to suspend the registration.

## I. SIGNIFICANCE OF EPA'S DECISION ON IMMEDIATE SUSPENSION OF FIFRA REGISTRATION

We begin by reviewing the significance of an EPA decision to issue or withhold an order of immediate suspension of a pesticide registration, pending final administrative consideration.

ineradicable lack of standing, we would not issue this opinion even though it had been argued and prepared prior to *Sierra.* That is not the situation before us. We assume the statute according review to any person adversely affected is substantially equivalent to the Administrative Procedure Act's test of "aggrieved by agency action," 5 U.S.C. § 702. *Sierra* makes clear that the Court is retaining all of its decisions establishing a "modernized law of standing" so as (a) to embrace injury in fact, suffered or anticipated, to environmental—including aesthetic, conservational and recreational—as well as economic interests; (b) to prohibit dismissal of a litigation where there is an "arguable" claim of injury; and (c) to permit the person who has standing by virtue of present or future injury to particular interests to urge grounds of objection based on "public interest," acting in this respect as a "private attorney general." See *Sierra* at 92 S.Ct. 1371, reiterating approval of the trend of cases voiced in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

*Sierra* in no wise supports or countenances the contention that FIFRA affords review only to registrants and applicants for registration. Insofar as it rejects that contention, Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App. D.C. 391, 428 F.2d 1093 (1970), remains undiminished by *Sierra.*

*Sierra* permits an organization to conduct litigation on the basis of injury to its members. This court recognized that as the basis of standing in National Automatic Laundry and Cleaning Council v.

Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971), where we discoursed on the reasons for recognizing associations to present the interests of members and added that a court would not be inclined to take issue with such assertion of interest if recognized by the executive branch.

As for the particular case, we think EDF's allegation that it is composed of "citizens dedicated to the protection of our environment" is adequate to cover protection from carcinogenic inputs as well as other matters, and such danger obviously affects the health of the individual members of petitioner. As the Court noted in *Sierra:* "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."

We think it fair to proceed on the basis that the absence of timely objection— which would have permitted ready response—reflects the Government's recognition that any objection to standing based on the wording of petitioner's pleadings would not be consequential, more like a plea of abatement than a plea in bar.

We think the interest of justice is furthered by proceeding with the issuance of this opinion, reflecting the decision already reached on the case, accompanied with a notation that following the remand, the Government may raise the question of standing, if it be so advised, and the petitioner may refine its allegations of interest.

### A. *The Statutory Framework of FIFRA*

Since 1970 the Administrator of the EPA has been charged with administering the two systems provided by Congress to regulate the introduction of potentially harmful pesticides into the environment: the establishment of registration and labeling requirements for "economic poisons" under FIFRA, formerly assigned to the Secretary of Agriculture; and the establishment of tolerance limits for shipment in interstate commerce of crops "adulterated" by pesticide residues, under the Food, Drug and Cosmetic Act, 21 U.S.C. 301, et seq., formerly assigned to the Department of Health, Education & Welfare.[2]

Aldrin and dieldrin are "economic poisons" under the definition in § 2 of FIFRA, 7 U.S.C. § 135(a) (1), and hence are required to be registered with EPA before they may be distributed in interstate commerce, 7 U.S.C. § 135b. An economic poison may lawfully be registered only if it is properly labeled—not "misbranded." Section 2(z) of FIFRA, insofar relevant here, provides that an economic poison is "misbranded," 7 U.S.C. § 135(z) (2)—

(c) if the labeling accompanying it does not contain directions for use which are necessary and if complied with adequate for the protection of the public;

(d) if the label does not contain a warning or caution statement which may be necessary and if complied with adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals;

\*    \*    \*    \*    \*    \*

(g) if in the case of an insecticide, nematocide, fungicide, or herbicide when used as directed or in accordance with commonly recognized practice it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds, to which it is applied, or to the person applying such economic poison.

If an economic poison is such that a label with adequate safeguards cannot be written, it may not be registered or sold in interstate commerce, 7 U.S.C. § 135a(a)(5).

■ The burden of establishing the safety of a product requisite for compliance with the labeling requirements, remains at all times on the applicant and registrant. Whenever it appears that a registered economic poison may be or has become "misbranded," the Administrator is required to issue a notice of cancellation. EDF v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971).

In § 4 of FIFRA, as amended, 7 U.S. C. § 135b(c), Congress has provided extensive safeguards for those whose FIFRA registrations are challenged. Whenever an application for registration is refused, the applicant may request that the matter be referred to an advisory committee, of a size and membership of experts as determined by the Administrator, or may file objections and request a public hearing. The same options are available in case of a notice of cancellation of registration; cancellation becomes effective within 30 days after service of the notice unless the registrant petitions for reference to an advisory committee, or files objections and requests a public hearing.

In case the committee is requested, the statute provides that the committee shall submit a report and recommendation as to registration as soon as practicable after submission to the committee, but not later than 60 days unless the period is extended by the Administrator for another 60 days. Within 90 days after receipt of the committee's report the Administrator shall make his determination as to registration, by issuing an order with findings of fact. Then the applicant or registrant has 60 days to file objections and request a public

---

2. Reorganization Plan No. 3 of 1970, effective December 2, 1970, established the EPA, in large part for the purpose of con-solidating these functions, 35 Fed.Reg. 15623.

hearing for the purpose of receiving material evidence. The Administrator is required to take action—as soon as possible, but not more than 90 days, after completion of the hearing—by issuing an order granting, denying, or cancelling the registration, or requiring modification of the claims or labeling.

Hence a substantial time, likely to exceed one year, may lapse between issuance of notice of cancellation and final order of cancellation, as provided by the various 60-day and 90-day periods set forth. In addition, there is the possibility that a cancellation order might be stayed pending court review in this court or another appropriate circuit court of appeals. 7 U.S.C. § 135b(d).

The elaborate procedural protection against improvident cancellations emphasizes the importance of the immediate suspension provision available under § 4 of FIFRA, for use when appropriate:

> Notwithstanding any other provision of this section, the Administrator may, when he finds that such action is necessary to prevent an imminent hazard to the public, by order, suspend the registration of an economic poison immediately. In such case, he shall give the registrant prompt notice of such action and afford the registrant the opportunity to have the matter submitted to an advisory committee and for an expedited hearing under this section.

■ Because of the potential for delay, and consequent possibility of serious and irreparable environmental damage from an erroneous decision on suspension, a refusal to suspend is a final order reviewable immediately, EDF v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970).[3]

B. *Recent Decisions Concerning DDT*

We now turn to recent decisions concerning EPA's administration of the pesticide control statutes in light of our expanding national commitment to environmental rehabilitation. In EDF v. Hardin, *supra*, we held that EDF had standing to challenge official determinations under the FIFRA as representative of those "adversely affected" by the environmental impact of DDT. We concluded that the Secretary of Agriculture's failure to act on EDF's request for suspension of DDT registrations for an appreciable time was reviewable as "tantamount to an order denying suspension," 428 F.2d at 1099. The case was remanded either for a "fresh determination" on EDF's suspension request or for elucidation of basis for refusal "in sufficient detail to permit prompt and effective review," 428 F.2d at 1100.

Some three months later EDF again sought review of the EPA's explicit refusal either to order suspension or to issue notices of cancellation for all uses of DDT, EDF v. Ruckelshaus, 142 U.S. App.D.C. 74, 439 F.2d 584 (1971). The findings accompanying the EPA's refusal to issue notices of cancellation clearly demonstrated recognition that a "substantial question" existed as to the safety of DDT. Since "that is the standard for the issuance of cancellation notices under the FIFRA," 439 F.2d at 595, we remanded the case again, with instructions to issue notices for all DDT registrations "and thereby commence the administrative process." We adhered to our earlier holding that the decision not to suspend was reviewable immediately. Since the Administrator again had not explained the reasons for his refusal to suspend, we asked "once more . . . for a fresh determination on that issue," *id*. at 596. We left the Administrator free to explain his decision in terms of the general considerations at work in pesticide suspension cases or by discussion of the factors specifically relevant to DDT that influenced his decision. See *id*.:

> If regulations of general applicability were formulated, it would of course be possible to explain individual decisions by reference to the appropriate regu-

3. 7 U.S.C. § 135b—(c) & (d).

lation. It may well be, however, that standards for suspension can best be developed piecemeal, as the Secretary evaluates the hazards presented by particular products.

We emphasized, in both EDF v. Ruckelshaus, and Wellford v. Ruckelshaus, 142 U.S.App.D.C. 88, 439 F.2d 598 (1971), that the "FIFRA confers broad discretion on the [Administrator] . . . not merely to find facts, but also to set policy in the public interest," 439 F.2d at 601. We indicated our reluctance to override his apparent reservation of suspension authority as "an emergency power," [4] to be exercised or not only after careful consideration of "both the magnitude of the anticipated harm, and the likelihood that it will occur."

## II. EPA'S REASONS FOR DECLINING TO ORDER IMMEDIATE SUSPENSION OF ALDRIN AND DIELDRIN REGISTRATIONS

### 1. The Decisions Taken By The EPA Administrator

The EPA initiated an administrative investigation into registrations for aldrin and dieldrin that resulted in cancellation of registrations for certain uses. On December 2, 1970, the EDF addressed a petition to the Administrator requesting the suspension and eventual cancellation of registrations for all products containing aldrin and dieldrin. In order to expedite the administrative process, and in light of our January 1971 decisions in EDF v. Ruckelshaus and Wellford v. Ruckelshaus, relating to DDT, and 2, 4, 5-T, the Administrator consolidated the consideration of registrations of DDT; 2, 4, 5-T; aldrin and dieldrin. On March 18, 1971, he issued his Statement of Reasons Underlying the Registrations Decisions concerning these products, the decision to issue notices of cancellation for all registrations for those substances, and also the decision not to order interim suspension of registrations pending administrative decision.

EPA's decision to issue notices of cancellation "merely sets in motion the administrative process" and is not a reviewable order, EDF v. Ruckelshaus, 439 F.2d at 592. As to EDF's petition for suspension of registrations, the Administrator accepted the alternative contemplated in EDF v. Ruckelshaus, to develop suspension criteria case-by-case, pointing out that the "magnitude of the variables intrinsic in particular decisions" made binding general regulations impractical, Statement, p. 7. But in recognition of the "desirability of giving general guidance," the Administrator articulated a framework of "certain general factual and policy variables."

### 2. General Approach of EPA Statement of Reasons

This suffices for an introduction to the Statement of Reasons. We now examine it with greater care, and begin with the considerations voiced by the Administrator as defining EPA's general approach.

#### Statutory Tests

The EPA's Statement begins with the pertinent Statutory Tests under FIFRA, as presently in force, stating that its thrust is to prohibit—

- those economic poisons which do not contain directions for use which are necessary and adequate for the protection of the public;

- those economic poisons which do not contain a warning or caution statement which is adequate to prevent injury to man, vertebrate animals, vegetation and useful invertebrate animals; and

- those insecticides or herbicides which, when used as directed or in accordance with commonly recognized practice, are injurious to man, vertebrate animals or vegetation (except weeds).

4. Wellford v. Ruckelshaus, supra, 439 F.2d at 601.

The EPA points out that the final decision on registration depends on a balance struck between benefits and dangers to the public health and welfare from the product's use, and comments that the concept of safety of the product is under evolution and refinement in the light of increasing knowledge.[5]

*Suspension*

The EPA's Statement points out that whereas a notice of cancellation is appropriate whenever there is "a substantial question as to the safety of a product," immediate suspension is authorized only in order to prevent an "imminent hazard to the public," and to protect the public by prohibiting shipment of an economic poison "so dangerous that its continued use should not be tolerated during the pendency of the administrative process." The EPA described its general criteria for suspension as follows:

> [T]his Agency will find that an imminent hazard to the public exists when the evidence is sufficient to show that continued registration of an economic poison poses a significant threat of danger to health, or otherwise creates a hazardous situation to the public, that should be corrected immediately to prevent serious injury, and which cannot be permitted to continue during the pendency of administrative proceedings. An "imminent hazard" may be declared at any point in a chain of events which may ultimately result in harm to the public. It is not necessary that the final anticipated injury actually have occurred prior to a determination that an "imminent hazard" exists. In this connection, significant injury or potential injury to plants or animals alone could justify a finding of imminent hazard to the public from the use of an econom-

ic poison. The type, extent, probability and duration of potential or actual injury to man, plants and animals will be measured in light of the positive benefits accruing from, for example, use of the responsible economic poison in human or animal disease control or food production.

*General Standards*

Part II of the Statement of Reasons, captioned "Formulation of Standards," begins with the general standards deemed pertinent to the administration of FIFRA.

EPA points out that, in general, economic poisons, including those under present consideration, are "ecologically crude"—that is, by reason of technology limitations, are toxic to non-target organisms as well as to pest life. Thus continued registration for particular ecologically crude pesticides "are acceptable only to the extent that the benefits accruing from use of a particular economic poison outweigh" the adverse results of effects on nontarget species. EPA cites "dramatic steps in disease control" and the gradual amelioration of "the chronic problem of world hunger" as examples of the kind of beneficial effect to be looked for in balancing benefits against harm for specific substances. But it cautions that "triumphs of public health achieved in the past" will not be permitted to justify future registrations, recognizing that fundamentally different considerations are at work in evaluating use of a dangerous pesticide in a developed country such as the United States rather than in a developing non-industrial nation.

The immense difficulties of achieving a comprehensive solution to pesticide control are manifest from the Administrator's Statement of Reasons. It records that there are nearly 45,000

---

5. "In applying these statutory tests, the final decision with respect to whether a particular product should be registered initially or should continue to be registered depends on the intricate balance struck between the benefits and dangers to the public health and welfare resulting from its use. The concept of the safety of the product is an evolving one which is constantly being further refined in light of our increasing knowledge."

presently outstanding pesticide registrations for "hundreds" of substances in use over approximately five percent of the total land area of the United States. Available data show wide variety among individual substances both as to effectiveness against target species and as to potential harm to non-target species. Laboratory tests with some substances have raised serious questions regarding carcinogenicity that "deserve particular searching" because carcinogenic effects are generally cumulative and irreversible when discovered. Threats presented by individual substances vary not only as to observed persistence in the environment but also as to environmental mobility—which in turn depends in part on how a particular pesticide is introduced into the environment, either by ground insertion or by dispersal directly into the ambient air or water.

Based on the discussion of these general considerations, the EPA concludes that individual decisions on initial or continued registration must depend on a complex administrative calculus, in which the "nature and magnitude of the foreseeable hazards associated with use of a particular product" is weighed against the "nature of the benefit conferred" by its use.

3. *Discussion of Aldrin and Dieldrin*

The EPA's general analysis for suspension, set forth above, is supplemented in the Statement of Reasons by discussions concerning the particular products. Part IV, Dieldrin and Aldrin, comprises slightly more than two pages of the Statement.

*Dangers Presenting Substantial Questions to Safety*

We set forth the paragraphs pertinent to the dangers of aldrin and dieldrin considered to present substantial questions as to safety, even though the decision to issue notices of cancellation is not subject to review, because they provide perspective for the questions we must consider.

The questions raised concerning the safety of these products are similar to those encountered with DDT in that they result from the persistence of dieldrin (since aldrin residues quickly break down into dieldrin) in the environment and its potential toxicity at low levels. Some studies indicate that dieldrin alone, or in possibly synergistic combination with DDT, has an equivalent potential for adverse effect on non-target predatory wildlife resulting from its low level toxicity intensified by its mobility and concentration up certain food chains. The scientific data also indicate that dieldrin, again like DDT, has an affinity for storage in the fatty tissue of a number of animals, including humans. There are also similar carcinogenic data developed in the laboratory from high dosage rates of dieldrin administered to test animals.

Dieldrin and aldrin apparently have a lower threshold of toxicity to warm-blooded animals than does DDT. In fact, instances of non-lethal human poisoning have occurred in those occupationally exposed to heavy concentrations of dieldrin for protracted periods. Recovery following removal from exposure was slow but apparently complete. These potential hazards deserve a full public airing in the administrative forum provided by the cancellation proceeding.

*Denial of Suspension*

The Administrator's reasons for denial of suspension, as to aldrin and dieldrin, appear in the following paragraphs of the Statement:

[B]ecause the vast majority of the present use of these products is restricted to ground insertion, which presents little foreseeable damage from general environmental mobility, because of the pattern of declining gross use, and because the lower historic introduction of these products into the environmental residue burden to be faced by man and the other biota, the delay inherent in the administrative process does not present an imminent hazard. Thus the substan-

tial question of the safety of these registrations is primarily raised by theoretical data, while review of the evidence from the ambient environment indicates that such potential hazards are not imminent in light of the present registrations.

It is significant to note that no residues of either aldrin or dieldrin are now permitted on corn, eggs, milk, poultry, or animal fats shipped in interstate commerce. Because of the use patterns of aldrin and dieldrin, these products constitute the major sources whereby these substances would find their way into human food chains. During the pendency of the administrative process hereby initiated, this Agency will take no action to grant any residue tolerances for these foodstuffs pursuant to the Food, Drug and Cosmetic Act, although initial tolerances have been requested by the manufacturer.

## III. THE EDF'S CONTENTIONS OF INVALIDITY OF NON-SUSPENSION DECISIONS

The EDF's petition from the EPA's decision not to suspend aldrin and dieldrin, pending the administrative process, has two prongs: First, it challenges the sufficiency of the analysis of the relevant factual data. Secondly, it contends that the Administrator has failed to provide a consistent statement of reasons for the refusal to suspend.

A. *Contentions As To EPA Conclusions Of Limited Nature Of Immediate Harm*

■ 1. EDF first disputes the EPA's three factual conclusions, underlying its conclusion of non-imminency of harm, that: "the vast majority of the present use of these products is restricted to ground insertion, which presents little foreseeable damage from general environmental mobility;" that "the pattern of declining gross use, and

. . . the lower historic introduction of these products into the environment has left a significantly lower environmental residue burden to be faced by man and the other biota;" and that "the substantial question of the safety of these registrations is primarily raised by theoretical data, while review of the evidence from the ambient environment indicates that such potential hazards are not imminent in light of the present registrations." The EDF characterizes these conclusions as "irrational" in light of the data before the agency—in other words argues that they have no fair support in the record. We do not agree. The evidence supporting the Administrator was far from uncontested. But the function of the suspension decision is to make a preliminary assessment of evidence, and probabilities, not an ultimate resolution of difficult issues. We cannot accept the proposition, implicit in EDF's position, that the Administrator's findings regarding harm were insufficient because controverted by respectable scientific authority. It was enough at this stage that the administrative record contained respectable scientific authority supporting the Administrator.

■ 2. The EPA's one-sentence discussion of carcinogenicity of aldrin and dieldrin presents a harder question. EDF made a non-trivial showing with respect to carcinogenicity, a matter we have emphasized in the past, EDF v. HEW, 138 U.S.App.D.C. 381, 428 F.2d 1083 (1970). The EPA asks us not to consider the aldrin-dieldrin discussion, standing alone, but to take it as incorporating, by reference, the more detailed carcinogenicity discussion in the Administrator's DDT section. We do not demand sterile formality. In appropriate cases, if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.[6]

---

6. Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F. 2d 330 (1968); Natural Resources De-

fense Council, Inc. v. Morton, D.C.Cir., 458 F.2d 827 (January 13, 1972).

On the other hand, candor compels us to say that when the matter involved is as sensitive and fright-laden as cancer, even a court scrupulous to the point of punctilio in deference to administrative latitude is beset with concern when the cross-reference is so abbreviated. All the Statement of Reasons says, after noting that dieldrin, like DDT, has an affinity for storage in the fatty tissue of animals, is this:

> There are also similar carcinogenic data developed in the laboratory from high dosage rates of dieldrin administered to test animals.

All this purports to say is that the test animal laboratory data (indicating carcinogenicity) for dieldrin are similar to the data for DDT. Is this meant to indicate also, that EPA transfers the same lack of scientific consensus, or, for example, that the EPA extrapolates that the conclusions of the MRAK Commission Report as to DDT—that there is suspicion but it is neither a proven danger nor assuredly safe—also applies to aldrin-dieldrin? That is a great deal to find as implicit in the word "similar." Such transfer and extrapolation may well be sound, but it is not necessarily sound, or obvious, at least to a reviewing court, and the matter is important enough to warrant the care of explicitness.

■ We need not decide this question for, as will appear, the record must go back to EPA for other reasons. Even assuming this problem alone would not have required a remand, we do not think it unduly burdensome to ask EPA to explicate, while it has the subject matter before it for further consideration, the nature and extent of incorporation of its DDT statement on carcinogenicity.

### B. Claim Based On Lack Of EPA Identification Of Benefits To Offset Possible Dangers

The EDF's main argument runs thus, briefly stated: While the Statement of Reasons sets forth, as a matter of EPA policy, that suspension decisions would be made only after the Administrator makes a preliminary assessment of imminency of hazard that includes a balancing of benefit and harm, yet when the EPA discussed aldrin and dieldrin, it inconsistently failed to identify any off-setting benefits, and limited itself to the reference to certain hazards.

The EPA concedes that the "thrust" of the Administrator's analysis related to the absence of any short run major hazards. But it parries that he "did refer to the purposes for which aldrin and dieldrin are used."

> In light of his findings with respect to the absence of any foreseeable hazard, there was little need for the Administrator to go into detail in considering—as he had indicated he would do in suspension decisions. . . — "the positive benefits."

### Propriety of General Approach To Suspension Orders That Considers Benefits Along With Burdens

■ We are not clear that the FIFRA requires separate analysis of benefits at the suspension stage.[7] We are clear that the statute empowers the Administrator to take account of benefits or their absence as affecting imminency of hazard. The Administrator's general decision to follow that course cannot be assailed as unreasonable. The suspension procedures of this agency, though in the abstract designed for emergency situations, seem to us to resemble more closely the judicial proceedings on a contested motion for a preliminary injunction, to prevail during the pendency of

---

7. In fact, at an earlier point in this sequence of proceedings, the Administrator appeared to be tending toward a somewhat more restrictive, "harm-oriented" definition of "imminent hazard." See Wellford v. Ruckelshaus, supra, 439 F.2d at 601, n. 12.

the litigation on the merits, rather than proceedings on an ex parte application for an emergency temporary restraining order. The suspension decision is not ordinarily one to be made in a matter of moments, or even hours or days. The statute contemplates at least the kind of ventilation of issues commonly had prior to decisions by courts that govern the relationships of parties pendente lite, during trial on the merits.

▮ Judicial doctrine teaches that a court must consider possibility of success on the merits, the nature and extent of the damage to each of the parties from the granting or denial of the injunction, and where the public interest lies.[8] It was not inappropriate for the Administrator to have chosen a general approach to suspension that permits analysis of similar factors. By definition, a substantial question of safety exists when notices of cancellation issue. If there is no offsetting claim of any benefit to the public, then the EPA has the burden of showing that the substantial safety question does not pose an "imminent hazard" to the public.

*Lack Of Discussion Of Benefits Of Aldrin-Dieldrin*

EDF is on sound ground in noting that while the EPA's general approach contemplates a decision as to suspension based on a balance of benefit and harm, the later discussion of aldrin and dieldrin relates only to harm.

▮ The Administrator's mere mention of these products' major uses, emphasized by the EPA, cannot suffice as a discussion of benefits, even though

the data before him . . . reflected the view that aldrin-dieldrin pesticides are the only control presently available for some twenty insects which attack corn and for one pest which poses a real danger to citrus orchards . . . .

Brief for EPA, p. 19. The interests at stake here are too important to permit the decision to be sustained on the basis of speculative inference as to what the Administrator's findings and conclusions might have been regarding benefits. Sound principle sustains the practice of vesting choice of policy with the Administrator. Its corollary is that the specific decision must be explained, not merely explainable, in terms of the ingredients announced by the Administrator as comprising the Agency's policies and standards. This is the case even though the variables of the policy approach selected by the Administrator are not necessarily required by the underlying statute.

▮ Our conclusion that a mere recitation of a pesticide's uses does not suffice as an analysis of benefits is fortified where, as here, there was a submission, by EDF, that alternative pest control mechanisms are available for such use. The analysis of benefit requires some consideration of whether such proposed alternatives are available or feasible, or whether such availability is in doubt.[9]

*Flexibility of Limited Suspensions For Uses Without Significant Benefits*

▮ The importance of an EPA analysis of benefits is underscored by the Administrator's flexibility, in both

8. Delaware & Hudson Ry. Co. v. United Transportation Union, 146 U.S.App.D.C. 142, 450 F.2d 603, cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971); Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

9. It is worthy of note that the Administrator did undertake some discussion of alternatives in his Statement of Reasons for re-

fusing to suspend DDT registrations. He pointed out that DDT is the only "practical" pesticide against certain insect pests. Precipitous removal of DDT from interstate commerce would force widespread resort to highly toxic alternatives in pest control on certain crops. The widespread poisonings, both fatal and nonfatal, which may reasonably be projected present an intolerable short-term hazard. Statement, p. 16.

final decisions and suspension orders, to differentiate between uses of the product. Aldrin and dieldrin are apparently not viewed by the EPA as uniform in their benefit characteristics for all their uses. The Administrator had previously stopped certain uses of the pesticides in question in house paints, and in water use. These actions presumably reflected some evaluation of comparative benefits and hazards. The Administrator's reliance on the "pattern of declining gross use" itself indicates that for some purposes aldrin and dieldrin are or will soon become nonessential. Even assuming the essentiality of aldrin and dieldrin, and of the lack of feasible alternative control mechanisms for certain uses, there may be no corresponding benefit for other uses, which may be curtailed during the suspension period.[10]

*Flexibility As To Limits*

█ Our concern over EPA's failure to discuss benefits reflects our concern that what is done tacitly or by implication may mean that the agency has not taken into account the possibility of orders falling short of complete suspension. EPA has flexibility not only to confine suspensions to certain uses, but also to order conditional suspensions for uses, available only if certain volumes or limits are not exceeded. EPA apparently assumed certain limits of use would prevail. But if there are dangers, and if the benefits of use may be satisfied within certain limits of use, the EPA should consider whether to exercise its authority to determine that the extent of use permitted pending final determination must be held within announced limits.

*Analysis of Limited*
*Short-Run Harm*

We do not say there is an absolute need for analysis of benefits. It might have been possible for EPA to say that

although there were no significant benefits from aldrin-dieldrin the possibility of harm—though substantial enough to present a long-run danger to the public warranting cancellation proceedings—did not present a serious short-run danger that constituted an imminent hazard. EPA's counsel offers this as a justification for its action.

█ If this is to be said, it must be said clearly, so that it may be reviewed carefully. Logically, there is room for the concept. But we must caution against any approach to the term "imminent hazard," used in the statute, that restricts it to a concept of crisis. It is enough if there is substantial likelihood that serious harm will be experienced during the year or two required in any realistic projection of the administrative process. It is not good practice for an agency to defend an order on the hypothesis that it is valid even assuming there are no benefits, when the reality is that some conclusion of benefits was visualized by the agency. This kind of abstraction pushes argument—and judicial review—to the wall of extremes, when realism calls for an awareness of middle ground.

*Articulation of Criteria*

█ Our comments according EPA substantial policy choice and discretion are not to be taken as mere lip service to established principle, that is undercut by the need we find for better articulation. We recognize that EPA's functions are difficult and demanding and are impressed by the thoughtfulness and range of EPA's general approach; nor have we any reason to doubt the wisdom and validity of its specific decisions. But the demand of functions so difficult of decision are accompanied by demands, equally difficult to meet, for attentive consideration and careful exposition. Our own responsibility as a court is as a

---

10. The EPA stated with respect to DDT that effective limitation on use might require more than could be accomplished by EPA administrative measures, and might require legislation to provide a machinery, using pest control consultants, that would provide permission for certification of the property of a particular use at a particular location and time. Statement of Reasons, p. 17.

partner in the overall administrative process—acting with restraint, but providing supervision.[11] We cannot discharge our role adequately unless we hold EPA to a high standard of articulation. Kennecott Copper Corp. v. EPA, D.C.Cir., 462 F.2d 846 (1972). The EPA is charged with profoundly important tasks; reclamation and preservation of our environment is a national priority of the first rank. It is not an agency in the doldrums of the routine or familiar. The importance and difficulty of subject matter entail special responsibilities when the EPA undertakes to explain and defend its actions in court.

Environmental law marks out a domain where knowledge is hard to obtain and appraise, even in the administrative corridors; in the courtrooms, difficulties of understanding are multiplied. But there is a will in the courts to study and understand what the agency puts before us. And there is a will to respect the agency's choices if it has taken a hard look at its hard problems.[12] We emphasize again the judicial toleration of wide flexibility for response to developing situations. The Administrator's premise of relatively low environmental residue burden from aldrin and dieldrin, a consequence of low past and declining present usage, may lead him to consider possible use of interim actions short of complete suspension—continuing registrations selectively, with restrictions on kinds and extent of use, either by orders or, perhaps, through enforceable, voluntary agreements by registrants. The court's concern is for elucidation of basis, not for restriction of EPA's latitude.

## IV. PROVISION FOR FURTHER CONSIDERATION

We are not vacating the action before us. At argument we were informed of the deliberations of the aldrin-dieldrin scientific advisory committee, and it is public knowledge that its report has recently been filed. The EPA's Statement of Reasons stated that its suspension decisions would be re-examined on receipt of the committee's report. That course is sound practice, and indeed is an implicit requirement of law, for the administrative process is a continuing one, and calls for continuing re-examination at significant junctures. American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). The availability of re-examination in light of the committee report confirms our view that formal findings are not required at the initial decision on suspension.

The EPA proposes to study the committee's analyses and recommendations. We think it in the interest of justice, see 28 U.S.C. § 2106, that the record be remanded to the EPA for consideration at the same time of this opinion. This remand leaves the EPA with latitude, without judicial restrictions, to continue, vacate or modify its order on the question of suspension of aldrin and dieldrin.

So ordered.

---

11. Greater Boston TV Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

12. WAIT Radio v. FCC, 135 U.S.App. D.C. 317, 418 F.2d 1153 (1969); Greater Boston v. FCC, *supra*, note 10; EDF v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971).