**NATIONAL COALITION AGAINST THE MISUSE OF PESTICIDES, et al., Appellees,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, et al., Appellants.**

**No. 88–5147.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1988.

Decided Feb. 3, 1989.

Atty. Gen., Anne S. Almy and J. Steven Rogers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Victor M. Sher, Seattle, Wash., with whom Paula Dinerstein and Gerald I. Sommer, Washington, D.C., were on the brief, for appellees.

James F. Flug, Washington, D.C., also entered an appearance for appellees.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and GIBSON,* Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Administrator of the Environmental Protection Agency appeals from an order of the district court permanently enjoining EPA from permitting "sales, commercial use and commercial application of existing stocks" of the termiticides chlordane and heptachlor pursuant to a settlement agreement under which the producers of the chemicals agreed to voluntary cancellation of the chemicals' registrations under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y (1982 & Supp. IV 1986). *See National Coalition Against the Misuse of Pesticides v. EPA,* 679 F.Supp. 55, 60 (D.D.C.1988). We think the district court misconstrued the relevant provisions of FIFRA by holding unlawful EPA's determination to permit continued sale and use of existing stocks of the cancelled termiticides. Accordingly, we reverse the district court and remand with instructions to vacate the injunction and thereby allow EPA to fulfill its commitments under the original settlements.

## I.

FIFRA provides a comprehensive framework for regulating the sale and distribution of pesticides within the United States.

Kathleen P. Dewey, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

Under the statute, EPA may not approve a pesticide's introduction into commerce unless the Administrator finds that the pesticide "will not generally cause unreasonable adverse effects on the environment" when used in accordance with any EPA-imposed restrictions and "with widespread and commonly recognized practice." 7 U.S.C. § 136a(c)(5)(D) (1982). "Unreasonable adverse effects on the environment" are defined to include "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 136(bb). With few exceptions, FIFRA prohibits the sale, distribution, and professional use of unregistered pesticides. *Id.* §§ 136a(a) & 136j(a)(1).

Once registered, pesticides are still subject to continuing scrutiny by EPA. *See generally id.* § 136d. Indeed, section 6 of FIFRA requires EPA to cancel a pesticide's registration after the first five years in which the registration has been effective (and at the conclusion of subsequent five year periods if the registration is renewed) "unless the registrant, or other interested person with the concurrence of the registrant, ... requests ... that the registration be continued in effect." *Id.* § 136d(a). And at any time, EPA may propose cancellation of a registration and initiate elaborate cancellation proceedings if "it appears to the Administrator that a pesticide ... does not comply with [FIFRA] or ... generally causes unreasonable adverse effects on the environment...." *Id.* § 136d(b).

During the pendency of cancellation proceedings, the registration remains in effect unless the Administrator "suspend[s] the registration of the pesticide immediately." *Id.* § 136d(c). But before suspending, the Administrator must determine that an "imminent hazard" exists—that "continued use of the pesticide during the time required for cancellation proceeding[s] would be likely to result in unreasonable adverse effects on the environment...." *Id.* § 136(*l*). Even then, FIFRA guarantees registrants the right to an expedited administrative hearing on that issue, and the pesticide's registration remains effective during this latter proceeding. *Id.* § 136d(c)(2). Only if "the Administrator determines that an emergency exists that does not permit him to hold a hearing before suspending" may he prohibit commerce in the pesticide in advance of administrative proceedings. *Id.* § 136d(c)(3).[1]

While commerce in unregistered pesticides is generally prohibited, the Administrator may permit continued sale and use of existing stocks of pesticides whose registrations have been cancelled provided "he determines that such sale or use is not inconsistent with the purposes of this subchapter and will not have unreasonable adverse effects on the environment." *Id.* § 136d(a)(1). It is this last provision—section 6(a)(1), concerning the disposition of existing stocks—that we are called upon to interpret today.

Chlordane and heptachlor (to which we refer simply as "chlordane") are part of a class of chlorinated hydrocarbon insecticides known generally as "cyclodienes," introduced into the marketplace for general use in the late 1940s and early 1950s. In recent years, the chemical has been sold and distributed both by chlordane's sole manufacturer, Velsicol Chemical Company, and a number of so-called "reformulator" companies who acquire chlordane from Velsicol and manufacture derivative products. Until 1987, Velsicol and the reformulators maintained various registrations for these products with EPA.

The regulatory action challenged here—concerning the termiticide uses of chlordane—follows an earlier, fiercely disputed

---

1. Final orders of suspension following a hearing are immediately reviewable in the courts of appeals in accordance with 7 U.S.C. § 136n, even though the underlying cancellation proceedings have not yet run their course. *See* 7 U.S.C. § 136d(c)(4) (1982 & Supp. IV 1986). Emergency suspension orders are likewise reviewable in court prior to the conclusion of the cancellation proceedings, but such latter review may be had initially only in district court and then "solely to determine whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law." *Id.*

controversy regarding the more general uses of the chemical. In 1974, following an intensive three-year agency investigation into the human and environmental health effects of chlordane exposure, EPA issued a notice of intent to cancel the bulk of chlordane's registered uses. *See* 39 Fed. Reg. 11,298 (Nov. 24, 1974). This was followed eight months later by a notice of intent to suspend most registered uses of the chemical during the pendency of cancellation proceedings. Velsicol unsuccessfully contested the proposed suspension and sought review of the Administrator's suspension order in this court, but we ultimately upheld that decision. *See Environmental Defense Fund, Inc. v. EPA*, 548 F.2d 998, 1005 (D.C.Cir.1976). Lengthy cancellation proceedings continued thereafter until EPA and the registrants concluded a settlement agreement in 1978, *see* Fed.Reg. 12,372 (March 6, 1978), under which the disputed registrations were phased out over four years with unlimited use of existing stocks. *See id.*

The termiticide uses of chlordane were not subject to the 1978 settlement, but the risks and benefits of such uses have been under more or less continuous study by EPA since the late 1970s. As part of this review effort, EPA in December 1986 released "Guidance for the Re-registration of Pesticide Products Containing Chlordane as an Active Ingredient" which, pursuant to the Administrator's statutory authority, required chlordane registrants, including Velsicol, to generate and submit to the Administrator certain data concerning the health effects of chlordane under permitted uses. *See generally* 7 U.S.C. § 136a(c)(2)(B) (1982). The National Coalition Against the Misuse of Pesticides ("NCAMP"), concerned about the allegedly imminent hazards posed by chlordane, filed a formal petition with EPA on March 23, 1987, seeking emergency suspension and cancellation of all chlordane product registrations. NCAMP disputed the need for additional studies, asserting that "available information is more than adequate to support an immediate ban and recall of all [chlordane] products from the market."

A month later, John A. Moore, Assistant EPA Administrator for Pesticides and Toxic Substances, responded to NCAMP's petition by defending EPA's latest "data call-in" as "enabl[ing] EPA to assess exposure and risks associated with the proper application of termiticides on the basis of data gathered according to specific protocols and subject to EPA validation of analytical results." Assistant Administrator Moore assured NCAMP that a complete evaluation of these data together with a decision on appropriate regulatory action would be forthcoming during the summer. In fact, while not disclosed in EPA's letter to NCAMP, EPA officials were preparing a draft Technical Support Document ("TSD") concerning the risks and benefits of chlordane for inclusion in the administrative record to support EPA's ultimate regulatory judgment. This document, completed in July 1987, proposed that "the risks of continued use [of chlordane] outweigh the benefits." Presumably on the basis of the draft TSD, EPA contemporaneously prepared a draft notice of intent to cancel the termiticide registrations of chlordane.

In the meantime, NCAMP and the other plaintiffs brought this action in district court seeking cancellation and emergency suspension. Unbeknownst to them, at some point either shortly before or after the institution of litigation, EPA became engaged in settlement discussions with Velsicol concerning Velsicol's termiticide registrations. These negotiations led to an agreement whereby Velsicol consented to cancellation of certain registered termiticide uses, to suspension of certain others pending the completion of outstanding "data call-ins," and to a cessation of all manufacture, distribution, and sale of chlordane. In exchange, EPA agreed to permit indefinitely the sale and use of existing stocks of chlordane outside the control of Velsicol, which EPA estimated to amount to a two-months' supply at normal application rates.[2]

---

**2.** Contemporaneously, EPA apparently executed similar voluntary cancellation agreements with certain of the reformulator registrants of chlordane. These settlements were not made public

Upon publication of the settlement terms, plaintiffs amended their complaint and moved to restrain EPA from permitting any use of the existing stocks exempted from the EPA–Velsicol agreement, claiming that EPA had arbitrarily and capriciously failed to make the required FIFRA section 6(a)(1) determination that "continued sale and use of [those] existing stocks ... [would] not have unreasonable adverse effects on the environment." 7 U.S.C. § 136d(a)(1) (1982). After an initial hearing, the district court ordered EPA to produce an administrative record of its decision together with other materials pertinent to factual issues raised by plaintiffs' claims. EPA complied, producing, among other documents, the draft TSD, the draft notice of intent to cancel, and a statement of Assistant Administrator Moore concerning the agency's basis for entering into the Velsicol settlement.

The Assistant Administrator's statement began by asserting that the evidentiary standards for a cancellation, suspension, and emergency suspension of a pesticide are different, with the latter two of the three being especially rigorous. He then recounted the scientific evidence (which he claimed was both disputed and incomplete) concerning the health risks of chlordane exposure, and, as required by the statute, weighed those risks against the "substantial" economic benefits of continued use of chlordane. In view of this risk-benefit analysis, and in light of EPA's conclusion that such analysis did not "warrant[ ] an emergency suspension, or even an ordinary suspension," Dr. Moore stated that EPA had preliminarily decided to issue only a

notice of intent to cancel chlordane's termiticide registrations. Under these circumstances, according to Dr. Moore, the subsequent settlement with Velsicol, and its existing stocks provision:

effected a dramatic reduction in the amount of chlordane compared to what would have been sold and used if there had been no settlement. Of course, if the cancellation proceeding did not result in cancellation, substantially greater amounts of chlordane would continue to have been used. Even if there had been a suspension hearing ..., the six months of hearings would have produced substantially more chlordane than is currently in the hands of applicators and distributors. Thus, the existing stocks provision in the settlement agreement did not constitute a true concession on the Agency's part; it did not permit any additional use that would not have occurred had the Agency declined to adopt the settlement.

Thus, EPA's section 6(a)(1) determination in support of the existing stocks settlement provision rested principally [3] on the notion that formal cancellation (and suspension) proceedings would allow much larger quantities of chlordane to be introduced into the environment.[4]

On cross motions for summary judgment, the district court found EPA's final section 6(a)(1) determination inadequate. According to the court:

An adequate § 6(a)(1) determination must analyze the risks and benefits from the sale and use of existing stocks and determine whether or not such sale and use would be consistent with FIFRA and

until the fall of 1987. Other reformulators had their product registrations suspended for failure to respond to EPA's December 1986 "data call-in," *see* 7 U.S.C. § 136a(c)(2)(B)(iv) (1982); the existing stocks outside the control of this latter group were subject to no restrictions as well.

While, as far as we can discern, the injunction entered below did not affect the terms of the Velsicol settlement, since under that agreement (as revised) use of existing stocks was to cease by April 15, 1988 anyway, many of the settlements with the reformulator registrants contained existing stock authorizations which were to extend beyond the court-imposed deadline.

**3.** We say "principally" because Dr. Moore also cited the drain on agency resources that formal

proceedings would occasion along with the perceived risk that such formal proceedings might, if contested, result in reregistration of chlordane's termiticide uses.

**4.** In a Supplementary Statement of Reasons prepared at the court's request, the Assistant Administrator defended the reformulator settlements on similar grounds, proffering evidence that existing stocks of chlordane—including both Velsicol's and the reformulators' supplies— would be dwarfed by the quantity of chlordane likely to be produced and distributed during formal cancellation proceedings.

whether or not such sale and use would pose any unreasonable risk to man or the environment. Instead, defendants found only that the settlement agreement permitting the use of existing stocks would result in less use (and therefore less risk) than would a proceeding to cancel the pesticide's registration without a suspension of the registration during the proceeding. This finding does not meet the requirements of § 6(a)(1).

*NCAMP,* 679 F.Supp. at 59 (citation and footnote omitted). The district court thus construed section 6(a)(1) of FIFRA, in the context of cancellation settlements, to require that the Administrator focus his analysis solely on the risks and benefits of continued use of the quantity of *then*-existing stocks, without consideration of what quantities of product might be *added* to pesticide stocks during agency proceedings sans a settlement agreement.[5] Accordingly, the district court held that EPA had failed to comply with section 6(a)(1) and issued an order requiring EPA to prohibit by April 15, 1988, "sales, commercial use and commercial application of existing stocks of chlordane ... which have been the subject of voluntary cancellations...." *Id.* at 60.

## II.

 The district court implicitly interpreted section 6(a)(1)[6] to require the Administrator, when he negotiates a voluntary cancellation agreement, to assume hypothetically that he has already issued a cancellation order before he considers the existing stocks question. If a cancellation order formally issued—if cancellation proceedings had concluded—then the Adminis-

trator, when he turned to the issue of existing stocks, would have no reason to consider stock sales made during the pendency of litigation. Those sales or uses would have been accomplished and therefore beyond the regulatory power of the Administrator. So, according to appellees and the district court, it is illegitimate for the Administrator to take into account sales or uses that would otherwise be made during the period of litigation when negotiating an agreed-upon cancellation. In other words, the phrase "such sale or use" in section 6(a)(1) refers only to sales or uses separately contemplated after a registration is actually cancelled, and therefore the Administrator's interpretation of section 6(a)(1) allowing consideration of sales or uses that would take place absent the settlement is impermissible.

We think the statutory language is "silent or ambiguous with respect to the specific issue" before us, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), because it is apparent that Congress drafted this provision without the notion of agency cancellation settlements in mind. Section 6(a)(1) does not explicitly contemplate an agreed-upon cancellation order. Rather, it refers only to automatic cancellations after five years' registration and to cancellations pursuant to section 6(b) after the Administrator initiates cancellation proceedings and conducts any requested hearings. 7 U.S.C. § 136d(a)(1) (1982). Since appellees do not deny that Congress implicitly authorized the Administrator to enter into such agreements, we conclude that Congress expressed no specific intent on the statutory construction issue before us. Neither the

---

**5.** The court therefore found it unnecessary to inquire into the reasonableness of EPA's determination that suspension or emergency suspension of chlordane's registrations was inappropriate. *See* 679 F.Supp. at 59 n. 1.

**6. (1) Procedure.—** * * * [T]he Administrator may permit the continued sale and use of existing stocks of a pesticide whose registration is canceled ... to such extent, under such conditions, and for such uses as he may specify if he determines that *such sale or use* is not inconsistent with the purposes of this subchapter and

will not have unreasonable adverse effects on the environment.

7 U.S.C. § 136d(a)(1) (1982) (emphasis added). FIFRA further defines "unreasonable adverse effects on the environment" to mean:

    **(bb) Unreasonable adverse effects on the environment.—** The term "unreasonable adverse effects on the environment" means any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.

*Id.* § 136(bb).

statutory language nor a single reference in the legislative history is directed to the subject of cancellation settlements. Under *Chevron*, then, our responsibility is limited to asking whether the Administrator's construction is a permissible interpretation of the statute. *See Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–82.

■ Keeping in mind that it is common ground that the statute contemplates settlements, it seems relevant to the second half of our *Chevron* inquiry that the Administrator's interpretation facilitates such voluntary cancellations and the district court and appellees' interpretation does not. If the Administrator were not authorized to enter into settlement agreements containing existing stocks exemptions, registrants would have every incentive to contest cancellation proceedings, both for the prospect of prevailing and to use litigation time to dispose, at minimum, of existing stocks.[7] In construing statutes that authorize enforcement proceedings, we look with disfavor upon interpretations offered by parties, in opposition to the administering agency, that induce litigation by making settlement impracticable. *See, e.g., Northeast Bancorp, Inc. v. Board of Governors*, 849 F.2d 1499, 1503 (D.C.Cir.1988); *Center for Auto Safety v. Lewis*, 685 F.2d 656, 662–63 (D.C.Cir.1982). Yet, this is precisely the sort of construction appellees advance.

Appellees contend that this litigation risk, which the Administrator avoids through settlement, is illusory. They emphasize that the proponent of continued registration bears the burden of persuasion as to whether a given chemical "generally causes unreasonable adverse effects on the environment." *See, e.g.*, 40 C.F.R. §§ 164.-121(g), 164.80(b) (1987). But this procedural rule—as important as it may be—hardly eliminates the litigation risk for the Admin-

istrator, when acting in his prosecutorial role. Nor do our cases holding that the Administrator satisfies his burden of production by proffering "substantial evidence" of harm from respected scientific sources, *see Environmental Defense Fund, Inc. v. EPA*, 548 F.2d 998, 1005 (D.C.Cir.1976). *Environmental Defense Fund, Inc. v. EPA*, 510 F.2d 1292, 1297 (D.C.Cir.1975); *Environmental Defense Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C.Cir.1972), mean that the Administrator is guaranteed victory if the proceedings are contested by the registrant and the ultimate order challenged subsequently in federal court. In any event, the Administrator *himself*, wearing his adjudicatory hat, might determine after an administrative hearing (involving the expenditure of substantial administrative resources) that scientific uncertainty as to the danger of a particular pesticide (combined perhaps with the economic impact of cancellation on "agricultural commodities, retail food prices and [ ] the agricultural economy," 7 U.S.C. § 136d(b) (1982)), indicates that the registration should not be cancelled.

We cannot see how the statutory purpose is enhanced by interpreting FIFRA's ambiguous language to force the Administrator to litigate aggressively, even where a settlement might avoid administrative costs, litigation imponderables and, perhaps most important, continued sales of the product during administrative proceedings. After all, the Administrator's charge under section 6(a)(1) is to determine whether permission to continue to sell or use existing stocks will have an *"unreasonable* adverse effect" on the environment. *Id.* § 136d(a)(1). If entering into a settlement provides for less use than would be the case if the Administrator initiated formal cancellation proceedings, it seems rather obvious that the settlement, at minimum, meets the statutory test of reasonableness.

---

7. During cancellation proceedings, the registrant may continue producing the subject pesticide and distribute these additional stocks to consumers. Indeed, unless the registrant possesses facts concerning the unsuitability of the pesticide for registration which he is withholding from the Administrator, he has every incentive to persist in his production effort during the pending of cancellation proceedings. In most circumstances, upon final cancellation the Administrator will be obliged to indemnify the registrant in the amount of the production cost of the cancelled pesticide in his possession at the time of cancellation. *See* 7 U.S.C. § 136m (1982).

Appellees argue that the Administrator's primary rationale for agreeing to the settlement terms—that more chlordane would have been sold and used during litigation than the small amount that the Administrator allowed to be disposed of as part of the settlement—is a red herring. The Administrator, it is contended, could have issued a notice of intent to cancel *and* proceeded immediately to a suspension order or an emergency order, either of which would have avoided the existing stocks problem. One obvious difficulty with the appellees' argument in this case, however, is that even a suspension order could not have been issued before a hearing was conducted (assuming one was requested), which we are told would likely have lasted six months. Only by use of a draconian emergency order would the Administrator have avoided a hearing delay. *Cf. Love v. Thomas*, 838 F.2d 1059, 1074 (9th Cir.1988) (discussing delay occasioned by suspension hearing). This argument, moreover, is a good deal broader than simply a challenge to the Administrator's settlement policy. Appellees assert that a determination on the part of the Administrator to issue a notice of intent to cancel a pesticide necessarily implies a determination—except in rare cases—that the basis for seeking a suspension or emergency order has been acknowledged. So, goes the argument, it is a violation of the statute—in the normal case [8]—for the Administrator not to seek interim expedited relief when he issues his notice of intent to cancel.

In this case, it will be recalled, the Administrator had not yet issued a notice of intent to cancel. A draft notice had been prepared, but settlement discussions commenced and concluded before the Administrator decided to issue the notice. This is not without significance, for FIFRA generally requires the Administrator to consult with the Secretary of Agriculture (on eco-nomic questions) and a seven-member Scientific Advisory Panel (on environmental health questions) prior to making public any notice of intent to cancel. 7 U.S.C. §§ 136d(b), 136w(d) (1982 & Supp. IV 1986).[9] We are informed that the Administrator had not yet engaged in the required consultation by the time the instant litigation began. Nevertheless, we do not think this point is decisive. Had the notice issued, we do not believe the case would require different analysis. Appellees' logic fails on this account: the EPA reasonably reads the statute to provide different evidentiary thresholds for the three procedures the Administrator is authorized to pursue in defeating an existing registration. Accordingly, we think appellees incorrect in assuming that grounds which may support a cancellation notice automatically warrant the Administrator's recourse to FIFRA's summary procedures.

The language of the statute and the case law amply demonstrate that EPA's reading, even if arguably not compelled by the legislative text, is at least consistent with it. A notice of intent to cancel is called for if it *"appears* to the Administrator that a pesticide ... generally causes unreasonable adverse effects on the environment." 7 U.S.C. § 136d(b) (1982) (emphasis added). We have interpreted this standard as obliging the Administrator to issue such a notice "and thereby initiate the administrative process whenever there is a substantial question about the safety of a registered pesticide." *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 594 (D.C.Cir.1971). That standard is perhaps even less rigorous than the typical "reason to believe" with which many agencies begin enforcement proceedings. *See generally FTC v. Standard Oil Co.*, 449 U.S. 232, 239–43, 101 S.Ct. 488, 493–95, 66 L.Ed.2d 416 (1980). Analytically, a notice

---

**8.** Under appellees narrow construction of the statute, the Administrator could refuse to seek suspension or emergency suspension upon noticing a cancellation only if he demonstrated either that short-term exposure to the pesticide does not present the same environmental hazards as long-term exposure, or that economic gains from certain immediate pesticide applications (for which alternative chemicals are not reasonably available) augment the benefit side of the short-term equation.

**9.** If the Administrator concludes that suspension of the pesticide's registration is appropriate, he may waive these consultation requirements. *See* 7 U.S.C. § 136d(b) (1982).

of intent to cancel is little more than "a determination ... that adjudicatory proceedings will commence." *Id.* at 241–42, 101 S.Ct. at 494.

By comparison, the Administrator may issue a notice of suspension only if he determines it "is necessary to prevent an imminent hazard" to human health or the environment. 7 U.S.C. § 136d(c)(1) (1982). If the notice is contested, the Administrator must conduct an "expedited" hearing before the suspension can take effect. *Id.* § 136d(c)(2). We have described that standard as calling for more than a mere "substantial question of safety"; it requires an appraisal that harm to humans or the environment "would be likely to result" during the period required for interagency consultation and cancellation hearings. *Id.* § 136(*l*); *see also Environmental Defense Fund, Inc.*, 548 F.2d at 1005 ("It is enough [to justify suspension] if there is *substantial likelihood* that serious harm will be experienced during the ... administrative process." (quoting *Environmental Defense Fund, Inc.*, 465 F.2d at 540)). The extraordinary step of emergency suspension is available only if the requisite unreasonable harm would be likely to materialize during the pendency of ordinary suspension proceedings.[10] *Dow Chem. Co. v. Blum*, 469 F.Supp. 892, 901 (E.D.Mich. 1979); *see Love v. Thomas*, 838 F.2d at 1068–74. The Administrator therefore reasonably requires a showing of even more immediate harm before he may halt commerce in a pesticide prior to conducting often lengthy administrative proceedings.

From these different statutory standards it follows that the quality and quantity of evidence of harm to the environment that the Administrator properly requires before choosing one of these three procedural routes will vary along a continuum. The statute authorizes the Administrator to reserve *expedited procedures for cases in* which the available data reliably demonstrate some sort of immediate threat or where the information before him suggests greater certainty concerning the pesticide's danger to humans than would warrant merely initiating cancellation proceedings. It is true that we have held that the Administrator bears a heavy burden of explaining his decision not to seek suspension when he has issued a notice of cancellation under circumstances where there are "no offsetting claim[s] of any benefit to the public" in using the pesticide. *Environmental Defense Fund, Inc.*, 465 F.2d at 539; *see Environmental Defense Fund, Inc.*, 548 F.2d at 1005; *Environmental Defense Fund, Inc.*, 510 F.2d at 1302. However, our prior decisions in no way purport to conflate the varying standards for issuing a cancellation notice, noticing a suspension, and imposing an emergency suspension.

Under EPA's reasonable reading of the statute, then, the facts placed before the Administrator that might justify issuing a notice of intent to cancel may not necessarily justify suspension or emergency suspension procedures. Perhaps the most important variable in the Administrator's decision, one discounted by appellees, is the degree of certainty the scientific data provide as to the pesticide's danger. In cases such as ours, where the scientific data are uncertain and scientific opinion divided, we do not think Congress intended FIFRA to compel the Administrator to initiate expedited procedures. With that understanding we think appellees' argument concerning the proper construction of section 6(a)(1) fails. It is not necessary for us to decide whether, if the Administrator had sought an interim prohibition of commerce in chlordane in this case and been challenged in court, we would have sustained his action. Suffice it for us to recognize that EPA reasonably distinguishes the standards for initiating these procedures. Given the difference in these discrete standards, it follows that there is no statutory bar to the Administrator's permitting sale or use of existing stocks in return for a registrant's consent to cancel an active pes-

---

**10.** EPA advises that it has invoked its emergency suspension authority on only three prior occasions.

ticide registration.[11]

## III.

■ The district court did not reach the question—which it had no need to do given its statutory construction—whether EPA's decision in this case not to pursue interim relief in favor of settling for a voluntary cancellation was arbitrary and capricious. We do so, rather than remand, since the issue is one of law and the record is complete.[12] We believe the Administrator's determination was within the bounds of reasonableness. Assistant Administrator Moore's declaration explained that "many scientists do not think that chlordane poses a major risk to humans" and that "this divergence of viewpoints is one of the reasons [he] believed it important to have the Scientific Advisory Panel review and comment on the cancer issue." Nor did the agency, according to Moore, have reliable data as to the precise impact on fish and wildlife of termiticide uses of chlordane. Appellees do not dispute these contentions, although they do advance the premise that chlordane's risk to humans—whatever the degree of scientific certainty—obliged the Administrator to use expedited procedures in this case. We do not agree. We think the fundamental scientific question concerning the environmental effects of chlordane's termiticide uses was sufficiently unsettled to justify the Administrator's putative determination to seek only an ordinary cancellation. Under these circumstances, we believe it was reasonable for the Administrator to conclude that the settlement he reached, providing as it did for continued sale and use of existing stocks of chlordane, would involve the introduction of more moderate quantities of the chemical into the environment than would have been so if contested proceedings had ensued. Only an emergency suspension order would have resulted in less distribution than the settlement; the Administrator's determination that no emergency existed seems unassailable.

\*    \*    \*    \*    \*    \*

For the reasons stated, we reverse and remand with instructions to the district court to vacate its injunction so that EPA may fulfill the obligations it undertook in eliciting the cancellation settlements.

11. *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795 (D.C.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989), cited by appellees, neither suggests nor requires a contrary reading of section 6(a)(1). There, construing the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361–1407 (1982 & Supp. III 1985), this court held that the Secretary of Commerce could not grant permission to a group of Japanese fishermen to "take" a quota of one protected species incident to salmon fishing when the Secretary knew or had reason to believe that other protected species would also be ensnared. 839 F.2d at 801–02. Since these other species could not be "taken" incidentally without the Secretary's express permission, the court found it contrary to law to issue a permit as to only one of the protected species with the intention of simply assessing civil penalties on the fishermen for taking other unnamed protected species "without" a permit. While in *Kokechik*, we concluded that the Secretary could not meet his obligation in enforcing the Act's moratorium on the taking of marine mammals simply by "determin[ing] which takes [would] be exempted from civil penalties," *id.* at 802, the present case involves no such distortion of FIFRA's enforcement regime. If the Administrator has a reasonable basis for believing suspension inappropriate, it is not an affront to FIFRA's goals to account for pesticide quantities that will likely be introduced into the environment during cancellation proceedings in the course of determining whether to trade an existing stocks exemption for a voluntary cancellation.

12. FIFRA's purpose in channeling to the district court review of decisions of the Administrator made without a hearing has been fulfilled, because the district court has generated an ample administrative record for judicial scrutiny of the chlordane settlements. Furthermore, we would owe no deference to the district court on the question whether the settlements were arbitrary and capricious.