BEYOND PESTICIDES/NATIONAL COALITION AGAINST THE MISUSE OF PESTICIDES, et al., Plaintiffs,

v.

Christine T. WHITMAN, Administrator of United States Environmental Protection Agency, Defendant.

No. 02–2419 (RJL).

United States District Court, District of Columbia.

June 20, 2003.

Paula Naomi Dinerstein, Lobel, Novins & Lamont, Washington, DC, for Beyond Pesticides/National Coalition Against the Misuse of Pesticides, Communications Workers of America, AFL–CIO, Center for Environmental Health, Joseph S. Pager, Rosanne M. Prager.

Mary K. O'Melveny, Communications Workers of America, Washington, DC, for Communications Workers of America, AFL–CIO.

Angeline Purdy, U.S. Dept. of Justice, Environ. Defense Section, F. James Handley, Handley Environ. Law, Michele L. Walter, U.S. Dept. of Justice, Washington, DC, for Christine T. Whitman.

W. Caffey Norman, III, Patton Boggs LLP, Washington, DC, for Pentachlorophenol Task Force.

## MEMORANDUM OPINION AND ORDER

LEON, District Judge.

Plaintiffs seek a preliminary injunction [1] claiming that the defendant, Environmen-

---

1. Plaintiffs in this action are Beyond Pesticides/National Coalition Against the Misuse of Pesticides ("Beyond Pesticides"); Communication Workers of America ("CWA"), AFL– CIO, Center for Environmental Health ("CEH"), Joseph S. Prager and Rosanne M. Prager.

tal Protection Agency ("EPA," "agency") Administrator Christine T. Whitman ("defendant"), has failed to suspend or cancel the registrations of all products containing pentachlorophenol ("penta"), a chemical commonly used as a wood preservative in utility poles, as it is required to do under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136–136y. According to plaintiffs, exposure to this chemical increases exponentially one's risk of cancer, as well as other health hazards, and thereby poses imminent harm to anyone who comes in contact with it.

Plaintiffs mount a two front challenge to EPA's conduct with regard to penta's registration. Primarily, plaintiffs argue that EPA has violated the FIFRA by failing to cancel or suspend penta's registration, as the statutory requirements for such action have been met.[2] Plaintiffs also claim that EPA's decision to engage in a reregistration process, rather than a special review, is an abuse of discretion, as reregistration is not an "appropriate vehicle" for assessing the risks and benefits associated with penta's use. *See* Pls.'s Mot. at 17; Pls.'s Reply at 19–20. Plaintiffs therefore ask this Court to find that EPA has already made findings sufficient to justify the immediate suspension and cancellation of penta's registration. Moreover, plaintiffs ask for further, alternative relief in the event that this Court does not order the cancellation or suspension of penta's registration.[3]

In stark contrast, defendants contend that this Court cannot reach the merits of plaintiffs' claim for injunctive relief because it lacks jurisdiction under Section 16 of the FIFRA, 7 U.S.C. § 136n. According to defendants, the FIFRA requires "final action" before this Court can exercise judicial review over claims brought pursuant to that act. Plaintiffs, in turn, however argue that EPA's failure to suspend or cancel penta's registration in the face of its submission to EPA of studies, correspondence, and a petition detailing the health and environmental risks posed by exposure to penta is tantamount to final action under Section 16 of the FIFRA, and this Circuit's holdings in *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C.Cir.1970) ("*Hardin*") and *Environmental Defense Fund Inc. v. Ruckelshaus*, 439 F.2d 584 (D.C.Cir.1971) ("*Ruckelshaus*").

For the following reasons, the Court finds that jurisdiction is lacking under the FIFRA, therefore, plaintiffs' motion is denied.

2. In plaintiffs' motion for preliminary injunction, they plainly state that they are seeking injunctive relief "pursuant to 7 U.S.C. § 136d(b)(1), and ... 7 U.S.C. § 136d(c)(3)" of FIFRA. Pls.'s Mot. at 1. In their reply brief, however, plaintiffs contend that they are also seeking relief in the form of an unreasonable delay claim under the Administrative Procedure Act (APA), even though plaintiffs never once mentioned the APA by name in their motion for preliminary injunction and only mention "unreasonable delay" at various points throughout their motion. *See* Pls.'s Reply at 4–6. Furthermore, throughout plaintiffs' motion, they characterize EPA's actions as alleged violations of the FIFRA only, and not the APA, and do not present any briefing or analysis of a potential APA claim.

Thus, it seems clear that plaintiffs' motion for preliminary injunction was narrower in scope that their Complaint, which not only brought claims under the FIFRA, but also the APA and the Resource Conservation and Recovery Act (RCRA). The Court therefore does not address unreasonable delay in the context of the motion for preliminary injunction.

3. In the alternative, plaintiffs ask this Court to order EPA to initiate cancellation proceedings; to remand the matter to EPA for a "more explicit determination on plaintiffs' petitions"; to order EPA to reach a final regulatory decision regarding penta's registration within a timetable set by this Court, or to order EPA to re-open the last RPAR review it conducted. Pls.'s Reply at 3, 18.

## I. BACKGROUND

In order to appreciate the parties' arguments regarding jurisdiction and, in particular, whether EPA's failure to suspend or cancel penta's registration is actually tantamount to "final action" under Section 16 of FIFRA, it is helpful to review the pertinent sections of FIFRA, the history of EPA's regulation of penta, and the plaintiffs' communications with the agency regarding its request that EPA suspend or cancel penta's registration.

### A. Statutory Background: the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA")

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136–136y, sets forth detailed regulations and procedures governing the sale, distribution and use of pesticides. Under FIFRA, pesticides must first be registered with the administrator of the EPA. Registration of a pesticide does not occur unless the Administrator determines that the pesticide does "not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D). FIFRA defines any "unreasonable adverse effect[ ] on the environment" as one that poses "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §§ 136a(b)(5), 136(bb). FIFRA also provides the EPA Administrator the authority to suspend or cancel a pesticide's registration when the pesticide no longer meets FIFRA's requirements. 7 U.S.C. § 136d(b). EPA must provide notice to registrants of its intent to either cancel a pesticide's registration, or to hold a hearing in order to determine whether the registration should be cancelled. *Id.* The Administrator is also permitted, under FIFRA, to immediately suspend a pesticide's registration upon issuance of its notice of intent to cancel the registration if the Administrator determines that it is necessary to prevent an "imminent hazard." 7 U.S.C. § 136d(c).

Once a pesticide is registered, FIFRA provides review procedures in order for EPA to continually reevaluate a pesticide's risks and benefits. Prior to 1988, EPA followed the Rebuttable Presumption Against Review ("RPAR") administrative process when reassessing a registered pesticide's risks and benefits. EPA could initiate a RPAR process without first issuing a notice of intent to cancel. Housenger Decl. ¶ 4. RPAR provided opportunities for both proponents and opponents of a pesticide's registration to comment on the risks and benefits associated with the pesticide. In 1988, Congress amended the RPAR procedures, thereafter known as "Special Review." The Special Review process is, in most respects, similar to the RPAR process. Like the RPAR process, Special Review affords registrants, opponents to registration, and the public generally an opportunity to comment on the risks and benefits associated with a registered pesticide. *See* 40 C.F.R. part 154.21, 154.26, & 154.27.

In 1988, Congress set forth in Section 4 of FIFRA a five-phase "reregistration" process for registered pesticides. *See* 7 U.S.C. § 136a–1; Housenger Decl. ¶ 7. The reregistration process is separate and distinct from the Special Review and RPAR processes. In Section 4 of FIFRA, Congress required EPA to reregister all pesticides that were first registered before November 1, 1984. *See* 7 U.S.C. § 136a–1(a). According to Jack E. Housenger, acting Associate Director of the Antimicrobials Division at EPA, the reregistration requirement covers approximately 600 ingredients found in pesticide products. *See* Housenger Decl. ¶ 7(a). During reregistration, registrants submit additional data and studies regarding the risks and bene-

fits associated with the pesticide. After the EPA reviews the submissions, it must issue a "Reregistration Eligibility Decision," ("RED"), in which it determines the pesticide's eligibility for reregistration, that is, whether the registered pesticide "causes unreasonable adverse effects to people or the environment when used according to the product labeling." *Id.* at 7(e). Reregistration occurs after EPA approves certain data and revised labeling submitted by the pesticide's registrants. *Id.* If EPA concludes a pesticide is not eligible for reregistration, FIFRA directs EPA to "take appropriate regulatory action." 7 U.S.C. § 136a–1(g)(2)(D). According to plaintiffs, the purpose of the reregistration review is to ensure that pesticides registered before 1984 meet current standards and regulations. Pls.'s Mot. at 16.

**B. History of EPA's Regulation of Penta**

Although penta was once approved for a variety of uses, its primary use today is as a wood preservative to protect and treat utility poles.

In 1978, EPA reviewed three wood pesticides—penta, creosote, and CCA—under the RPAR procedures then in effect under FIFRA. *See* Housenger Decl. ¶ 15; Pls.'s Mot. at 5. Approximately six years later, in 1984, EPA concluded the RPAR when it issued a notice of intent to cancel the registrations of all three preservatives. The Notice stated that the risks associated with penta, creosote, and CCA outweighed the benefits, unless the registrants were able to modify their products or registrations. Housenger Decl. ¶ 16. Ultimately, EPA reached a settlement agreement with the registrants in 1986 which provided for the pesticides' use as a wood preservative, and requiring certain label restrictions.

*See* Housenger Decl. ¶ 17. In addition, measures were implemented to bring the pesticides in compliance with FIFRA. *Id.* Plaintiffs insist that the registrations would have been cancelled due to the risks presented by the pesticides but for the fact that no viable alternatives existed. *See* Pls.'s Mot. at 7.

EPA began a reregistration review in 1997 of penta, creosote and CCA, which continues to this day. According to EPA, it is reviewing these pesticides together "to ensure that any regulatory action will consider potential impacts of substitution with the other active ingredients." Housenger Decl. ¶ 18. In 1999, EPA issued its draft preliminary risk assessment for penta alone which did not include an assessment of the risks posed by penta's HCB or dioxin contaminants. *Id.* at ¶ 19; Pls.'s Mot. at 6. Three years later, on November 27, 2002, EPA completed a new draft preliminary risk assessment of penta.[4] This draft is currently undergoing internal, agency review which, once complete, will be followed by a period of public comment. Housenger Decl. ¶ 22. The final risk assessment will be used to draft the RED for penta. According to EPA, it has recently begun its assessment of the benefits of penta. Throughout this process, as described more fully below, plaintiffs have corresponded with the agency regarding its review of penta's registration.

**C. Plaintiff's Communications with EPA Regarding Penta's Registration**

Since the penta reregistration process began in 1997, plaintiffs or their representatives and EPA have consistently communicated regarding plaintiffs' concerns about the alleged risks that penta, as well as CCA and creosote, pose to humans and the environment. Plaintiffs' dialogue with

---

4. According to EPA, the new draft differs from the 1999 version by incorporating a 1999 worker exposure study and including

risk assessments for penta's HCB and dioxin contaminants. *See* Housenger Decl. ¶ 22.

EPA has been conducted through correspondence, the submission of studies, and meetings with EPA officials, copies of which plaintiffs submitted as exhibits to their motion for preliminary injunction.

Until December 21, 2001, when plaintiffs formally petitioned EPA to immediately suspend and cancel penta's registration, their correspondence with EPA was confined to letters to EPA officials, participation in public comment to EPA's first draft preliminary risk assessment, and meetings with EPA officials. On June 2, 1997, Dr. Howard Freed and a group of eleven public health scientists and physicians which included, plaintiffs claim, members of Beyond Pesticides, sent a letter addressed to then-EPA Administrator Carol Browner which "urge[d] the agency to begin immediately an assessment of the various uses of treated wood and analyze the availability of alternatives that would replace the use of these various hazardous materials." Pls.'s Mot. Exhibit 9. The letter never sought cancellation or suspension of the pesticide and it did not use the word "petition." It did, however, highlight new evidence regarding the effects of penta on human health and the environment as well as alternatives to penta-treated wood utility poles. Assistant EPA Administrator Lynn R. Goldman responded in a letter dated July 9, 1997, and thanked Dr. Freed for his "inquiry." *Id.* Exhibit 10. Assistant Administrator Goldman explained that "it is not possible at this time to say that a specific use of penta is the paramount source of human exposure," and that EPA decided in the "mid–80s" to permit penta's use as a wood preservative because "the benefits exceeded the risks associated with treating the wood." *Id.* Goldman went on to say that penta would be reassessed during a reregistration review, which she expected to be completed, and an RED issued, by fiscal year 1998, and that "it might make sense" to assess alternatives once reregistration was complete. *Id.*

In February of 1999, plaintiff Beyond Pesticides met with then-Director of EPA's Antimicrobial Division Frank T. Sanders. According to plaintiffs, EPA informed Beyond Pesticides that the penta RED was in the draft stage, and the preliminary science chapter would not be available until late 1999. EPA ultimately released the chapter sometime in summer 1999, and plaintiffs submitted comments on the chapter as well as a copy of a report it authored entitled "Pole Pollution—New Utility Pole Chemical Risks Identified by EPA While Survey Shows Widespread Contamination" to EPA on December 21, 1999. Pls.'s Mot. Appendix B & Exhibits 7, 11. Plaintiffs' comments focused on what plaintiffs perceived was a "data gap" in the EPA's studies, and maintained that a "RED for PCP should be issued only if data on PCP . . . are complete and support reregistration." Pls.'s Mot. Exhibit 11 at 1. Finally, plaintiffs requested that EPA "take the next logical step and deny application for reregistration of all uses of pesticide products containing PCP." Again, the letter was not characterized as a petition, and plaintiffs did not ask EPA to pursue immediate suspension or cancellation of penta, but confined their comments to the reregistration review.

On July 21, 2000, John Vladeck, a member of Public Citizen Litigation Group, wrote EPA on behalf of Beyond Pesticides. Pls.'s Mot. Exhibit 12. Vladeck stated that the letter "should be considered a supplement to Beyond Pesticides' June 7, 1997 letter" sent by scientists and physicians who were members of Beyond Pesticides, and made a "formal request to the agency to initiate a proceeding to cancel the remaining registration for Penta as a wood preservative." *Id.* at 2. Beyond Pesticides submitted additional evidence which it believed weighed in favor of EPA taking immediate action to cancel penta's registration. *Id.* Susan Hayward, Acting Assis-

tant Administrator of EPA, responded to Mr. Vladeck's letter, acknowledging Vladeck's request "that the Environmental Protection Agency initiate proceedings to cancel the remaining registration for pentachlorophenol (penta) as a wood preservative." Pls.'s Mot. Exhibit 13. Assistant Administrator Hayward projected that the risk assessment phase of reregistration would end, and public comment would begin in 2001, and explained that "[t]he reregistration process will address the need for any further regulatory action, including potential cancellation . . . ." *Id.*

A similar letter to EPA Administrator Christine Todd Whitman followed on April 21, 2001. In that letter, Beyond Pesticides argued that recent findings in Florida pertaining to the use of wood preservatives in playground equipment "confirmed the need for EPA to take immediate action to stop the use of wood preserving pesticides." Pls.'s Mot. Exhibit 14. While Beyond Pesticides did not characterize its letter as a petition, it did ask the Administrator to "immediately suspend, on an emergency basis, the registrations of these pesticides and at the same time issue a Notice of Intent to Cancel the registration of these pesticides." Pls.'s Mot. Exhibit 14 at 1. Again, the Acting Assistant Administrator—at that time, Stephen W. Johnson—responded. In a letter dated May 16, 2001, Assistant Administrator Johnson stated that EPA was reassessing CCA, penta, and creosote "as part of the Agency's ongoing effort to ensure that older pesticides meet current safety standards," and after completion of that assessment, "the Agency will determine the appropriate steps in the regulatory process." Pls.'s Mot. Exhibit 16 at 1. EPA did not comment specifically on Beyond Pesticides' request that EPA immediately suspend and issue a Notice of Intent to Cancel penta's registration.

Finally, on December 21, 2001, Beyond Pesticides and other organizations submitted a formal petition to EPA calling for the immediate suspension and cancellation of penta's registration based on EPA's past findings regarding penta's risk as well as new evidence of its risk to public health and the environment. Pls.'s Mot. Exhibit 16 at 1. The petition set forth factual evidence that, according to Beyond Pesticides, showed extreme risk to public health and the environment from exposure to penta. Beyond Pesticides concluded that "[t]he outcome of a penta risk-benefit analysis . . . is clear because the carcinogenic effects of penta are dramatic, especially with regard to people with occupational exposure to penta." *Id.* at 14. Assistant Administrator Johnson, on February 5, 2002, again responded and acknowledged receipt of "your petitions" and stated that "[t]his interim reply to your petition constitutes neither a denial nor an acceptance of your petition." Pls.'s Mot. Exhibit 17.

As explained previously, EPA completed a new draft preliminary risk assessment of penta on November 27, 2002. Associate Director Housenger explains in his declaration that following the public comment period on the preliminary risk assessment, "it would be expected to take 6–8 months to complete a RED (if the Agency takes comments on a revised risk assessment prior to completion of a RED, it could take significantly longer)." Housenger Decl. ¶ 24. He notes, however, that "there are numerous foreseeable contingencies that can extend the timing, such as receiving new data or new analyses in the public comments, having new complicated scientific issues raised, and addressing difficult risk mitigation and implementation issues." *Id.* at ¶ 25. Housenger estimates that, accounting for these factors, completion of the RED could take "as long as three years in the unusual situation." *Id.*

## II. JURISDICTION OVER PLAINTIFFS' FIFRA CLAIMS

Before the Court can address the merits of plaintiffs' motion for preliminary injunction brought pursuant to FIFRA, it must first address whether it has jurisdiction to hear plaintiffs' claim.

EPA argues that this Court lacks jurisdiction to consider the plaintiffs' unreasonable delay claim because FIFRA provides for judicial review of final agency actions only. *See* Defs.'s Opp'n at 18. As EPA is currently conducting a reregistration review of penta, and has neither cancelled or suspended penta's registration, nor refused to do so, EPA contends there is nothing for this Court to review. EPA's argument is based on the judicial review provision of FIFRA, Section 16, 7 U.S.C. § 136n, which provides as follows:

> Except as otherwise provided in this subchapter, the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.

7 U.S.C. § 136n. Section 16, according to the EPA, explicitly lists the only circumstances in which this Court has jurisdiction pursuant to FIFRA: EPA's refusal to cancel or suspend a registration not following a hearing, its refusal to change a classification, and any "*other* final actions.'" Defs.'s Opp'n at 19 (citing 7 U.S.C. § 136n) (emphasis in original). Unreasonable delay claims, argues EPA, are clearly outside the scope of FIFRA's judicial review provision.

The plain language of Section 16, as defendants argue, does confine judicial re-

view to final agency actions. The statute specifically states that the "*refusal*" of the Administrator "to cancel or suspend a registration," or "other *final* actions of the Administrator" are reviewable by this Court. Thus, the question before the Court is whether EPA, in effect, has taken "final [agency] action" in regard to plaintiffs' petitions seeking cancellation or suspension of penta's registration by engaging in a protracted reregistration review of penta. Plaintiffs contend that EPA has, and point to two decisions by this Circuit as support for their argument that its delay in suspending or cancelling penta's registration amounts to a final action, thereby creating jurisdiction in this Court: *Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093 (D.C.Cir.1970) ("*Hardin*") and *Environmental Defense Fund Inc. v. Ruckelshaus,* 439 F.2d 584 (D.C.Cir.1972) ("*Ruckelshaus*"). While the Court agrees that jurisdiction is conferred where agency inaction is tantamount to a "final action," the Court does not believe that the circumstances of the instant case are sufficiently analogous to the situation before the Circuit Court in *Hardin* and *Ruckelshaus* such that jurisdiction is present here.

Both *Hardin* and *Ruckelshaus* stem from the Environmental Defense Fund's ("Fund") challenge to the government's failure[5] to act on a *petition* requesting cancellation and suspension of certain uses of the pesticide DDT. *See Hardin,* 428 F.2d at 1095–96; *Ruckelshaus,* 439 F.2d at 588. As in this case, the government claimed that the court had no jurisdiction to review a failure to act, as the Secretary of Health, Education, and Welfare had not issued a final order. Despite the fact that a final order had not been issued, the Court in *Hardin* found that "administra-

---

5. At the time of the *Hardin* and *Ruckelshaus* decisions, the Secretary of Health, Education, and Welfare was responsible for administer-

ing FIFRA and regulating pesticides. Now, under the current version of FIFRA, that responsibility falls to the EPA Administrator.

tive inaction has precisely the same impact on the rights of parties as denial of relief" and "an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Hardin*, 428 F.2d at 1099. Ultimately, the court remanded the case to the Secretary and ordered him to either reach a determination in petitioners' request for suspension or issue a "statement of reasons for his silent but effective refusal to suspend the registration of DDT." *Id.* at 1100. Thus, inaction in *Hardin* exclusively related to a failure to act on a suspension petition. Unlike this case, however, the Agency in *Hardin* was not involved in a simultaneous reregistration review of the chemical's usage, because FIFRA had not yet been amended to provide that procedural option to the Agency.

Two years later in *Ruckelshaus*, the Fund challenged, *inter alia*, the Secretary's response to the *Hardin* order in regard to the cancellation of DDT: that investigations of DDT's registration were "still in progress, [and] that final determinations have not been made concerning the uses for which cancellation notices have not been issued."[6] The Court in *Ruckelshaus*, after noting its concern that the Secretary could defeat the court's jurisdiction "by delaying his determination indefi-

nitely," ordered the Secretary to issue cancellation notices after concluding that the Secretary had already made a "number of findings with respect to DDT" and had ultimately "found a substantial question concerning the safety of DDT". *Id.* at 594, 595. Once again the Circuit Court focused on administrative conduct constituting "inaction" as it related to a pending suspension petition. The reregistration process was not even an option, let alone ongoing.

In a case such as this, however, where the reregistration process was underway when the suspension petition was filed, the question becomes whether EPA's ongoing reregistration review of the chemical which is the subject of the suspension petition constitutes the kind of "inaction" with respect to the petition that is tantamount to final agency action. Neither the *Hardin* nor *Ruckelshaus* cases addressed a situation like this, nor has any other case since. In *Hardin*, the Secretary had cancelled some uses of DDT, requested public comment on other uses, and took no action on a request for interim suspension; additionally, there was no prospect of further agency action. By comparison, the Agency here has been involved in a simultaneous reregistration review of the chemical's usage, a procedural option that was not even part of FIFRA when the *Hardin* and *Ruckelshaus* cases were adjudicated.[7] While the reregistration process is un-

---

6. *Ruckelshaus*, 439 F.2d at 592.

7. Defendant argues that FIFRA's amendment after the *Hardin* and *Ruckelshaus* cases were decided prevents this Court from relying on their holdings to find that jurisdiction exists where agency inaction is tantamount to a final order. Although it is true, as defendants argue to this Court, that the version of FIFRA in effect when *Hardin* and *Ruckelshaus* were pending did not include reregistration or any other post-registration process during which EPA could reassess the risks and benefits of a registered pesticide or receive public comment, *see* Def.s' Opp'n at 19–21, this was not the underpinning of the Circuit's opinions in regard to the jurisdiction issue. The Court discussed public involvement and public hear-

ings in *Ruckelshaus* only in analyzing at what point the Administrator was required under FIFRA to initiate the administrative process, which included public hearings; instead, its primary focus was the possibility that a Secretary could "defeat ... jurisdiction ... by delaying his determination indefinitely." *Ruckelshaus*, 439 F.2d at 593. Furthermore, the Court rejects the defendant's argument that the amendment of the judicial review provision after the *Hardin* and *Ruckelshaus* decisions so substantially changes it as to invalidate the holdings of those cases. As set forth above, FIFRA's current judicial review provision permits review of the Administrator's refusal to cancel or suspend a registration, refusal to change a classification, or "other

doubtedly taking longer than plaintiffs would prefer, the Court has no basis to find that EPA is either ignoring or intentionally prolonging the process. Indeed, the review is continually progressing, as is evidenced by the recent completion of a second draft preliminary assessment. And, while FIFRA provides for a five-phase reregistration review of pesticides, it contains no statutorily-required timetable for completion of the reregistration review. *See* Housenger Decl. ¶ 25. Furthermore, as the Circuit Court noted in *Hardin*, "[t]here are many factors that result in delay, and a court is in general ill-suited to review the order in which an agency conducts its business." *Hardin*, 428 F.2d at 1099. In light of Congress' directive that the agency perform over 600 reregistration reviews—a process which encompasses five separate phases set forth in Section 4 of FIFRA—and the agency's continued progress in conducting penta's reregistration review, this Court cannot conclude that, in this instance, "administrative inaction has [had] precisely the same impact

on the rights of the parties as denial of relief." *Id.*

The Court also does not find that EPA's decision to continue the ongoing reregistration review, rather than moving to suspend or cancel penta's registration in response to plaintiffs' 2001 petition, is either final action or "inaction" tantamount to a denial. EPA has made clear in its correspondence with Beyond Pesticides regarding its December 21, 2001, petition that its "interim reply to your petition constitutes neither a denial nor an acceptance of your petition." Pls.'s Mot. Exhibit 17. Moreover, the Administrator's decision to cancel or suspend a pesticide's registration is not a mandatory one. It is important to note that FIFRA vests discretion in the EPA Administrator to cancel or suspend pesticide registrations when the pesticide fails to meet FIFRA's requirements. Although plaintiffs in their motion for preliminary injunction state that EPA "*must* issue a notice of cancellation of the pesticide's registration" when it appears a pesticide does not satisfy the statutory language,[8] and

---

final actions." 7 U.S.C. § 136n. The provision in place at the time *Hardin* and *Ruckelshaus* were decided stated:

> In the case of actual controversy as to the validity of any order under this section, any person who will be adversely affected by such order may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeal for the District of Columbia Circuit, within sixty days after the entry of such order, a petition praying that the order be set aside in whole or in part.

7 U.S.C. § 135b(d) (1964) (repealed).

Defendants seem to suggest that the word "controversy" in the original judicial review provision of FIFRA allowed for judicial review of actions that were not yet final, but "sufficiently ripe to confer jurisdiction." Defs.'s Opp'n at 20 n. 9. According to the defendants, the court's reasoning in *Hardin* was "tied to the language of the review provi-

sion," therefore, its decision does not stand for the proposition that judicial review is available absent a final order. The Court does not find that *Hardin's* holding rests on presence of this word in the judicial review provision. In fact, when considering the judicial review provision as a whole, the provision contemplates that any person seeking judicial review under FIFRA would be doing so after the entry of an *order*. 7 U.S.C. § 135b(d) (1964) (repealed). Given that the language of the statute suggests that judicial review would be sought after final action, that is, entry of an order, and that, despite this, this Circuit found in *Hardin* and *Ruckelshaus* that judicial review was available without final action when "administrative inaction has precisely the same impact on the rights of the parties as denial of relief," the Court finds the defendants' arguments in this regard to be unpersuasive. The amendment of FIFRA, therefore, does not reverse the *Hardin* and *Ruckelshaus* holdings on jurisdiction.

8. Pls.'s Mot. at 10 (emphasis added).

cite as support for that proposition FIFRA Section 136d(b), the language of the statute is, in fact, permissive rather than mandatory. Section 136d(b) explains that the EPA Administrator *"may* issue a notice of the Administrator's intent" to cancel a registration or to hold a hearing regarding cancellation when "it appears to the Administrator that a pesticide or its labeling ... does not comply with the provisions of this subchapter." Likewise, in regard to suspension, the EPA Administrator "may," not must, order the suspension of a pesticide's registration if he or she "determines that action is necessary to prevent an imminent hazard." 7 U.S.C. § 136d(c)(1). Indeed, this Circuit noted in *Ruckelshaus* that FIFRA "vests discretion in the Secretary to determine whether an article is in compliance with the act, and to decide what action should be taken with respect to a nonconforming article." 439 F.2d at 593. Thus, EPA's failure to engage in the type of review plaintiffs' prefer, at the time plaintiffs request it is not the type of "inaction" tantamount to a final order under Section 16 of FIFRA. Accordingly, this Court lacks the necessary jurisdiction to reach the merits of plaintiffs' motion.

### III. CONCLUSION

For the reasons set forth above, this Court hereby DENIES plaintiffs' motion for preliminary injunction as it lacks jurisdiction under Section 16 of FIFRA, 7 U.S.C. § 136n.

SO ORDERED.